FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

03 AUG 14  PM 4: 28

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| HOT NEW PRODUCTS, INC., d/b/a FITNESSZONE, | ) ) ) |
| Plaintiff and Counterclaim Defendant, | ) ) ) |
| v. | ) )   CV 98-JEO-1730-S ) |
| TROTTER, INC., and CYBEX INTERNATIONAL, INC., | ) ) ) |
| Defendants and Counterclaim Plaintiffs. | ) ) ) |

**ENTERED**

AUG 14 2003

## MEMORANDUM OPINION

I.   INTRODUCTION ................................................................. 3

II.  FACTS ........................................................................ 4

    A.  The Parties ............................................................. 4
    B.  Trotter's Dealer and Service Network ................................... 5
    C.  Trotter's Trans-shipping Fee and Service ............................... 7
    D.  Use of the Internet .................................................... 9
    E.  The Dealer Performance Standards Program .............................. 12
    F.  Trotter and FitnessZone Meet .......................................... 15
    G.  The Brunos Invest in FitnessZone ...................................... 16
    H.  FitnessZone's Termination ............................................. 17
    I.  The Gym Source ........................................................ 18
    J.  Nordic Fitness ........................................................ 19
    K.  'N Shape .............................................................. 21
    L.  Other Dealers ......................................................... 22
    M.  True Fitness .......................................................... 23

III. STANDARD OF REVIEW ......................................................... 24

IV.  PLAINTIFF'S ANTITRUST CLAIMS ............................................... 27

    A.  Section One Claim ..................................................... 27

        1.  Failure to Prove the Necessary Elements .......................... 28

118

a.  Conspiracy to fix prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

   i.  DPSP is inconsistent with notion of a price fixing
      agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   ii. Sales practices are inconsistent with notion of price fixing
      agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

b.  Termination not because of price fixing conspiracy . . . . . . . . . . . . . 40

   i.   The plaintiff offered to follow more restrictive price
      restraints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   ii.  Other dealers selling below allowable discounts were not
      terminated  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   iii. Other reasons for the termination . . . . . . . . . . . . . . . . . . . . . . 43

      1.  Selling on the Internet . . . . . . . . . . . . . . . . . . . . . . . . . 43
      2.  "Drop-shipping" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      3.  Other dealers' territories . . . . . . . . . . . . . . . . . . . . . . . 44
      4.  Personal animus  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

c.  Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B. Robinson-Patman Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

1. The TSF Was a Resale Charge Not Covered by § 13(a)  . . . . . . . . . . . . . . 48
2. The "Lower Price" Was Equally Available to the Plaintiff  . . . . . . . . . . . . 53
3. The Plaintiff Suffered No Competitive Injury  . . . . . . . . . . . . . . . . . . . . . 55

V. PLAINTIFF'S STATE LAW CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

A. Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
B. Promissory Estoppel Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
C. Promissory Fraud Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
D. Fraudulent Suppression Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
E. Unjust Enrichment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
F. Recoupment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

VI. DEFENDANT'S COUNTERCLAIM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

A. Promissory Fraud  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
B. Promissory Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
C. Intentional Interference with Business Relationships . . . . . . . . . . . . . . . . . . 91

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

## I. INTRODUCTION

Hot New Products, Inc., which previously did business as FitnessZone (hereinafter "the plaintiff" or "FitnessZone"), brought this lawsuit on July 2, 1998, after it was terminated on July 1, 1997, as a dealer of exercise equipment manufactured by Trotter, Inc. (hereinafter "Trotter" or "the defendant").[1]  The plaintiff initially alleged that the defendant and 'N Shape Fitness, Inc. (hereinafter "'N Shape"), violated the antitrust laws of the United States.  (Doc. 1).  Specifically, the plaintiff alleged that the defendants (Trotter and 'N Shape) and others participated in a conspiracy to fix prices and to restrict geographic sales territories in violation of Section One of the Sherman Antitrust Act (15 U.S.C. § 1) (Count One) and illegally set prices for Trotter equipment through the use of improper fees, in violation of the Robinson-Patman Act (15 U.S.C. § 13(a) (Count Two)).  (Id.).

The defendants filed an "Answer and Partial Motion to Dismiss."  (Doc. 8).  Therein, they assert that the second claim is due to be dismissed for failure to state a claim upon which relief can be granted.  (Id. at 6).

On June 11, 1999, the plaintiff filed an amended complaint, alleging various additional state law claims, including breach of contract (Count Three), promissory estoppel (Count Four), promissory fraud (Count Five), fraudulent suppression (Count Six), unjust enrichment (Count Seven), recoupment (Count Eight), and intentional interference with contractual or business relations (Count Nine).[2]  (Doc. 23).

On November 8, 1999, the undersigned entered a report and recommendation, finding

---

[1] Trotter and Cybex International, Inc. (hereinafter "Cybex"), merged in mid-1997 and therefore are collectively referred to herein as "the defendant."

[2] The last count relates to 'N Shape only.  (Doc. 23 at Count Nine).

that the motion to dismiss was due to be denied.  Because the court did not have the consent of

the parties for disposition of this matter (*see* 28 U.S.C. § 636), the case was temporarily

reassigned to another judge.  Upon a review of the case, that judge determined that the motion to

dismiss was to be deemed a motion for summary judgment.  (Doc. 30).  The parties were then

afforded an opportunity to submit evidence and briefs in support of their positions.  (*Id*.).  Trotter

filed a brief (doc. 34) and supplemental brief (doc. 36) in support of the motion, the plaintiff filed

a brief in opposition (doc. 35), and Trotter filed a reply (doc. 37).

Trotter filed a motion to add various counterclaims for promissory fraud, promissory

estoppel, and intentional interference with business relationships.  (Doc. 71).  After affording the

parties an opportunity to brief the issues, the motion was granted.  (Doc. 84).

On August 28, 2001, the parties consented to the jurisdiction of the undersigned to final

dispositive jurisdiction in this matter.  (Doc. 86).  Two days later, the parties entered a stipulation

of dismissal of defendant 'N-Shape.  (Doc. 87).  'N-Shape was dismissed with prejudice on

August 30, 2001.  (Doc. 88).

The plaintiff filed a "Motion for Summary Judgment as to Defendant's Counterclaim"

(doc. 102) and the defendant filed a "Motion for Summary Judgment" (doc. 103) on April 15,

2002.  The motions have been fully briefed by the parties.

## II. FACTS[3]

### A. The Parties

Trotter was a manufacturer of commercial and consumer treadmills and other

---

[3] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the nonmoving party in the analysis of the motions herein.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

cardiovascular equipment. Cybex was a strength-equipment manufacturer. As noted already, effective mid-1997, Cybex and Trotter merged, leaving Cybex International, Inc., as the surviving company. (Merger Document (Ex. A)).[4] Prior to the merger, Trotter sold its equipment primarily through its international dealer network. (Roland Murray Dep. (hereinafter "Murray Dep.") (1998) (Ex. V1), Vol. 1 at 57-58).[5]

Gene Brasher (hereinafter "Brasher") and Bill Cooke (hereinafter "Cooke") opened a fitness specialty store, Nordic Fitness Products, Inc., of Alabama, the corporate predecessor to FitnessZone, in 1984. (Brasher Dep. (1998) (Ex. B1), Vol. 1 at 25-28). The Birmingham store offered health club quality equipment to consumers and commercial outlets for direct purchase. (*Id.* at 25-27, 79-81). Brasher sold Trotter treadmills from the outset of the business's opening. (*Id.* at 79-81).

### B. Trotter's Dealer and Service Network

Trotter's equipment was expensive. Trotter insisted that its customers receive service from its dealers. (Peter Haines Dep. (hereinafter "Haines Dep.") (Ex. O) at 20; Murray Dep. (1998), Vol. 1 at 234-37). Since the mid-1980's, Trotter stressed the importance of proper delivery, installation, and service by the dealers. (Haines at 20). To ensure complete satisfaction, Trotter believed that its dealers' technicians should be properly trained and certified ("Trotter-certified"),[6] (Murray Dep. (1998), Vol. 1 at 291-92), and should assemble the

---

[4] Unless specified otherwise, the exhibits referenced herein are located at document 104 in the record.

[5] As noted by the parties in their submissions, some of the witnesses in this case were deposed more than once. For those witnesses, the deposition citations will include a reference to the year in which the deposition was taken, the exhibit number (in document 104), and the volume number, if appropriate.

[6] "Trotter-certified" technicians were technicians that had taken Trotter's annual certification course, in which Trotter provided instruction on the proper servicing of its products.

equipment for the customer on site. (Harris Dep. at 20). Dealers and their trained technicians were expected to be within the same general geographic area as the customers to whom the dealers sold, so that it would be economically feasible to service those customers. (Murray Dep. (1998), Vol. 1 at 227-29; Bill Domineau Dep. (hereinafter "Domineau Dep.") (Ex. K) at 143-44). Trotter assigned its dealers loosely defined and designated market territories. (*Id.*, 143-45; Murray (1998), Vol. 1 at 225-29). As early as 1980, Trotter had "strategically selected a high-quality, high-price, high-service strategy, and that required local representatives to provide service to [its] customers both pre-sale and post-sale." (Haines at 16-17).

Dealer territories generally were defined as the area in which the dealer in question could provide effective service. (Domineau Dep. at 144-45; Murray Dep. (1998) at 229, 247-49). That area varied by dealer. (Murray Dep. (1998), Vol. 1 at 247-49; Haines Dep. at 31-32). The concern was that the dealer "provide delivery, installation and service for the customer." (Haines Dep. at 33, 84-85). In Trotter's May 1994 issue of *Strides*, Trotter's newsletter to its dealers, it stated:

> If dealers are having difficulty determining what constitutes a sale outside of their area, Trotter suggests that a dealer's territory be defined by the boundaries of their own delivery, installation, and service capability. When determining this capability, dealers may want to remember that Trotter has a 150 mile mileage restriction for travel reimbursement during a warranty service call, and that any distance over that amount must be cleared by Trotter's Customer Service department.

(Ex. X at 2). Trotter again reminded dealers of the territorial restrictions in the July 31, 1995, *Strides* issue. (Ex. Y at 2).

Jose Casanova (hereinafter "Casanova"), a principal with 'N-Shape Fitness, another authorized Trotter dealer in Birmingham, testified that dealers sold "wherever they could."

6

(Casanova Dep. (Ex. H) at 18-19).  Casanova mentioned this issue to his Trotter contact at least

ten times.  (*Id.* at 21).  Casanova sold outside 'N Shape's area "whenever [he] could."  (*Id.* at 25;

*see also id.* at 26 ("quite a few times")).  Casanova described conversations he had on this

subject with Mike Aguilar, Trotter's Southeastern Regional Manager, and Casanova's principal

contact at Trotter: "Corporately you're not supposed to sell [outside your area].  But if you did

sell, nothing happened."  (*Id.* at 33).  Aguilar told Casanova on a number of occasions that if a

dealer sold outside his territory nothing would happen.  (*Id.*).

On January 18, 1996, Aguilar informed FitnessZone in a letter that it had been selected as

"Trotter's only authorized full line dealer for the Birmingham market."  (Doc. 113, Ex. E).

### C.  Trotter's Trans-shipping Fee and Service

In about 1994, Trotter began having customer service problems with dealers selling

outside their territories and leaving a product "orphaned."  (Domineau Dep. at 76-77, 86-87).

Trotter's sales department implemented a "trans-shipping fee" ("TSF") policy, whereby Trotter

assessed a $750 fee on a dealer that sold outside of its designated territory without providing

service or without involving the local dealer to provide proper service.  (Murray Dep. (1998),

Vol. 1 at 238; Ex. X at 2).  The policy was created as a "funding mechanism to provide services

to customers if they were located outside of an area that the selling dealer could effectively

service."  (Haines Dep. at 28).  Trans-shipping was costing Trotter money, because the ultimate

burden of servicing an orphaned customer fell on Trotter.  (Domineau at 57-62).

The trans-shipping policy was announced to dealers in *Strides*:

> . . . .

> Over the years, it has not been uncommon for specialty fitness dealers to
> market and sell fitness equipment across state lines to customers that they cannot

service.  While we don't want to be in the business of getting in the way of closing a deal, we have always promoted the idea that there are ways that two dealers can work out a potential split in the dealer profit of the sale.  In the past, we have acted as a conduit between the dealer who makes the sale and the dealer who will be involved in installing and providing service to the customer.  We believe that it is to everyone's benefit that the customer receives the best service and installation, and that the profits are apportioned fairly between dealers.

When a treadmill is sold to another market area, we would like another TROTTER dealer to be involved in coordinating the dealer installation and service.  When a treadmill is shipped outside the market area without the involvement of another, local dealer, this "orphaned" treadmill is adopted by TROTTER, at a substantial cost to the company.

Because drop shipping continues to be a problem, despite our efforts to discourage the practice, TROTTER will enforce a $750 charge back fee to any dealer that trans ships TROTTER equipment outside this dealer's service area.  The enforcement of this charge back policy is effective June 1, 1994.  This fee covers TROTTER's service and warranty costs.  If dealers are having difficulty determining what constitutes a sale outside of their area, TROTTER suggests that a dealer's territory be defined by the boundaries of their own delivery, installation and service capability.  When determining this capability, dealers may want to remember that TROTTER has a 150 mile milage restriction for travel reimbursement during a warranty service call, and that any distance over that amount must be cleared by TROTTER's Customer Service Department.

TROTTER encourages all dealers across the country to work with other dealers in making sure that our customers receive the highest quality installation, delivery and customer service in the business.  Maintaining this image worldwide helps everyone, because completely satisfied customers are our best advertisements.

(Ex. X at 1-2).  Trotter reminded its dealers of the trans-shipping policy in a later issue of

*Strides*, dated July 31, 1995.  (Ex. Y at 2).

According to certain business records submitted by Trotter, this fee has been assessed

since 1994 by Trotter and Cybex on other dealers who trans-shipped products outside of their

market territory without providing proper delivery, installation, and service.  (Ex. 3).

Murray, a director of sales with Trotter, told Brasher (FitnessZone) that the $750 fee, if

assessed, was going to go to the local dealer. (Brasher Dep. (1998), Vol. 1 at 201). Richard Miller, the President of the Gym Source (hereinafter "Miller"), Trotter's top dealer, believed the same thing about where the fee was being sent. (Miller (Doc. 113, Ex. R) at 59). Miller stated, however, that he was aware of a Trotter dealer who sold outside his territory "all the time" and was not penalized. (*Id.* at 53). Jose Casanova at 'N Shape testified similarly. Even though his company sold outside its territory often, and Trotter knew about it, 'N Shape never paid a TSF. (Casanova Dep. at 60-65). Trotter assessed such a fee against 'N Shape on January 23, 1998.[7] (Doc. 113, Ex. F). Casanova testified that, nine or ten months after receiving the letter that assessed the TSF, Paul Haberstroh (hereinafter "Haberstroh") of Trotter told him to "forget about" the fee.[8] (Casanova at Dep. 62, 90).

Richard Miller opined that Trotter's retention of the fee was done "to fatten their [(Trotter's)] pockets." (Miller at 60). He also testified that Trotter's service costs would be the same no matter who had to service the product. (*Id.* at 60-61). Trotter's president also confirmed that it was acceptable for dealers to utilize independent service organizations to service Trotter products so long as they had been through Trotter training. (Haines at 31).

### D. Use of the Internet

In 1994 or 1995, Cooke approached Brasher with the idea of selling products over the Internet. (Brasher Dep. (1998), Vol. 1 at 40-42). Brasher and Cooke incorporated Hot New Products, Inc., in 1995 to market companies and products over the Internet. (*Id.* at 37-38). In

---

[7] The plaintiff asserts that the fee was not charged until after the lawsuit was initiated. That is incorrect because the letter cited by the plaintiff is dated January 23, 1998. (Doc. 113, Ex. F). This lawsuit was filed July 2, 1998. (Doc. 1). This misstatement appears to be understandable in view of the difficulty in reading the date on the letter.

[8] 'N Shape received bills for outstanding TSFs. Casanova was told that Trotter had to have the TSFs "on the books for now, but [he was] to forget about it." (Casanova at 62).

late 1995, Brasher changed the name of Nordic Fitness Products to FitnessZone and launched the FitnessZone website. (*Id.* at 62-64). Thereafter, FitnessZone and Hot New Products, Inc., merged into one company. (*Id.* at 71).

In the fall of 1995, Brasher and Cooke had discussions with Mark Onigman at Trotter concerning FitnessZone's desire to market and sell Trotter equipment over the Internet. (Brasher Dep. (1998), Vol. 1 at 224-30; Cooke Dep. (1998) at 199-200 (Ex. I1); Cooke Dep. (2000) at 40-42 (Ex. I2); Murray Dep. (1998), Vol. 2 at 474-84). Prior to authorizing FitnessZone to proceed with Internet sales of Trotter equipment, Onigman wanted to explore the possibility of Trotter developing its own website. (Brasher Dep. (1998), Vol. 1 at 228-30; Cooke Dep. (1998) at 195-200; Cooke Dep. (2000) at 40-41). Following internal discussions, Murray, Haines, and Onigman decided that Trotter did not have the money in its budget to develop its own website. (Murray Dep. (1998) at 481-83; Cooke Dep. (2000) at 41). Onigman informed Cooke and Brasher that Trotter did not have the money to develop its own website, but would support FitnessZone's efforts to market and sell Trotter equipment over the Internet. (Brasher Dep. (1998), Vol. 1 at 228-30; Cooke Dep. (2000) at 41-42). FitnessZone began marketing and selling Trotter equipment on its website in the fall of 1995. (Brasher (1998), Vol. 1 at 64, 230).

FitnessZone invested time and resources developing its website and adding a catalog of Trotter equipment. (Brasher Dep. (1998) at 275-82; Cooke Dep. (1998) at 79-141). Cooke contracted with Net Office in Atlanta, Georgia, to build, host, and maintain the website. (Cooke Dep. (1998) at 79-108). In early 1996, Cooke and Brasher brought in additional investors to provide necessary capital for the expansion of the business. (Cooke Dep. (1998) at 45-49). Cooke spent months working with programmers to enhance FitnessZone's position as an Internet

10

leader for fitness equipment. (Cooke Dep. (1998) at 128). FitnessZone spent money to purchase banner ads and keywords from Yahoo to ensure a top listing on the Yahoo search engine. (Cooke Dep. (1998) at 132-35). To increase speed and ability to handle increased traffic, FitnessZone incurred additional expenses to switch its commercial hosting provider from Net Office to BBN Planet. (Cooke Dep. (1998) at 139-40). In early 1996, FitnessZone hired its own programmers and assumed responsibility for designing and programming its website, including Trotter products. (Cooke Dep. (1998) at 140-41, 253-59).

About this same time, there were only one or two other fitness equipment stores, besides FitnessZone, selling over the Internet. (Brasher (2000) at 39). FitnessZone was the first dominant Internet selling site for fitness equipment. (*Id.*). The company was recognized in late 1996 in <u>USA Today</u> as having the top fitness website on the Internet, and it won numerous awards for its website. (*Id.* at 39-40).

Trotter trumpeted FitnessZone's success in the January 8, 1996, issue of *Strides*. The following passage is from an article entitled, "Alabama's Nordic Fitness Products," covering much of the third page of the four-page newsletter:

> The people at Nordic Fitness Products have also been investigating ways to promote their products and services on the Internet.

> "We recently placed our store and products in a Hot New Products page," says Gene [Brasher]. "There were 41,000 hits in one month. Now how many of those hits turn out to be leads is anyone's guess. It is clear to us, however, that we need to be in touch with the Internet and determine how it can help us with consumer as well as commercial sales."

(Doc. 113, Ex. A at 3).

Trotter published its "Policy on the Internet" in *Strides* in June 1996. It stated that "Internet advertising and marketing is inconsistent with the philosophy and foundation of the

11

Dealer Performance Program." (Ex. W at 2). It also stated that any "[l]eads obtained from outside of a dealer's established geographic territory must be immediately sent to the appropriate [local] dealer." (*Id.*).

FitnessZone's sales of Trotter equipment increased dramatically during the period in which FitnessZone sold Trotter equipment over the Internet. In the first six months of 1996, even though FitnessZone was continuing to build its website, its purchases of Trotter equipment increased by thirty-one percent from the same period in 1995. (Doc. 113, Ex. B (Report of Timothy Downard) at Ex. 6).

When an Internet sale was made, the customer would receive the equipment. If the delivery site was not in the dealer's territory, the customer would need to contact either FitnessZone, Trotter, or the local dealer for installation and/or service. FitnessZone, on occasion, would inform an out-of-state customer "that the local dealer would be obligated to service the machine even though [he or she] did not purchase the machine through them." (Alicia Hoegh Aff. (Ex. P) at ¶ 6).

Trotter assessed FitnessZone 15 TSF's for sales to customers in Texas, Indiana, New Mexico, Wisconsin, South Carolina, Pennsylvania, New York, Maryland, Kansas, and Colorado. (Ex. 4).

### E. The Dealer Performance Standards Program

In April 1996, Trotter promulgated its Dealer Performance Standards Program (hereinafter "DPSP"). (Doc. 113, Ex. C; Haines (Ex. O) at 25-26). One provision set forth recommended retail price discounts for Trotter equipment as follows:

**Minimum Pricing Standards**

To maintain product integrity, customer service and sales support, dealers are
encouraged to maintain the following pricing schedule:

| Sales* | Discounts No Greater Than |
|--------|---------------------------|
| Between $0 – $49,999 | 20% |
| Between $50,000 – $99,999 | 25% |
| $100,000+ | 30% |

*National Accounts with an annual volume of $250,000 or greater may qualify for
additional discounts.

(Doc. 113, Ex. C at 2).

The DPSP was sent to every Trotter dealer, and it was explained, in person, to the dealers

by Trotter managers.  The Trotter representatives particularly discussed the pricing provision.

(Casanova at 40; Brasher (1998) at 184-85).  The last page of the document was denominated an

"acknowledgment" form.  (Doc. 113, Ex. C at 3).  According to Trotter, the purpose of the

document was merely for the dealers to acknowledge that they had received the document.

(Murray (1998), Vol. 1 at 173).[9]  FitnessZone representatives declined to sign the form (Brasher

(2000) at 108), viewing it as being inconsistent with the agreement that Trotter and FitnessZone

had made concerning marketing on the Internet.  (*Id*. at 108-09).

Former Trotter Regional Manager Paul Haberstroh testified that prior to issuance of the

DPSP, dealers had "voice[d] their opinions" about "pricing integrity," and the dealers' comments

"may have contributed"[10] to the development of the pricing program.  (Haberstroh at 79-80).  The

standards were the result of input from dealers.  (Haines at 27).  Trotter stated in its newsletter

---

[9] Many dealers viewed the "acknowledgment" form as a document whereby they were to indicate their assent or
agreement to the DPSP and its requirements.  (*See generally* Brasher (2000) at 110, 115 ("Oh, I think if he signed it, he was
following it"; "I think it [signing the form] would be an execution of the document.")).

[10] Haberstroh did not know "for sure" if they did.  (Haberstroh at 80).

13

that the program was a "direct result of talks with and requests from our dealers." (Doc. 113, Ex.

I). The pricing program was "well-taken" by many of the dealers (Haberstroh Dep. at 96-97),

many of whom "applauded" the DPSP. (Murray Dep. (1998), Vol. 1 at 168). The DPSP was put

into place "[t]o clean things up, per se, because of people selling at lesser pricing at that type of

thing. So to clean up the market, per se." (Marc Snowhite Dep. (Doc. 113, Ex. 15) at 56).

Trotter was "asking [dealers] to sell a product . . . at that maximum allowable discount."

(Murray (1998) at 168). Murray stated that the program was mandatory.[11] (*Id.* at 169).

　　　Trotter dealer Rod Freeman of Fitness Systems stated in a letter to Roland Murray,

"While I don't think this will be an issue with Fitness Systems, Mike [a Trotter Regional

Manager] was very specific in defining further this [minimum pricing] paragraph. It is my

understanding based on Mike's explanation, that if Fitness Systems (or any other dealer for that

matter) deviates from this pricing schedule, we/they will be terminated as a Trotter dealer."

(Doc. 113 at Ex. J).

　　　In its Notice to Shareholders and in filings with the Securities & Exchange Commission,

Trotter referred to its "performance standards agreements with its dealers which are designed to

assure that the Company brand is properly positioned in the marketplace." (Doc. 113, Ex. K &

L). Trotter Regional Manager Dennis DeGrazia stated in a June 11, 1996 fax, "Here's the dealer

agreements all dealers have been signing of late." (Murray (2001) at 102-03; Doc. 113, Ex. M).

　　　As previously mentioned, the DPSP included an "acknowledgment form," which dealers

were asked to sign and return to Murray. According to Murray, part of the reason for the

---

[11] Murray stated, "In order to keep your dealership status with Trotter, this is the dealer program, these are the rules and procedures to follow to be a Trotter dealer. That's how we presented it." (Murray (1998) Vol. 1 at 169). He further stated that when the DPSP was presented, Trotter was "not asking for permission" from their dealers. (*Id.* at 170).

acknowledgment form was that Trotter "wanted to present the seriousness of this program." (Murray (1998) (Vol. 1) at 173). The majority of dealers returned the acknowledgment forms. (*Id.* at 175-76). Murray kept a "central file" containing the signed, returned acknowledgment forms. (*Id.* at 175-76).

### F. Trotter and FitnessZone Meet

In the summer of 1996, representatives from Trotter and FitnessZone met to discuss complaints received from other dealers about FitnessZone's Internet sales and its pricing of Trotter equipment. Murray, Onigman, and Mike Aguilar met with Cooke and Brasher in Chicago in July 1996 to discuss a "workable solution" to the problems within Trotter's existing dealer network. (Brasher (1998) at 235-41; Murray (1998) at 531-33). When no agreement was reached in Chicago, they agreed to meet again in Birmingham in August. (Brasher (1998) at 241; Murray (1998) at 532-33).

In August 1996, the same parties met in Birmingham. (Brasher (1998) at 245-49; Murray (1998) at 543-51). They again discussed proposals to incorporate Trotter's existing dealer network into the system to alleviate dealer complaints about FitnessZone's Internet sales. (Brasher (1998) at 246-47; Murray (1998) at 556). Murray told Brasher at that time that FitnessZone had been "too good a dealer too long" for them to be terminated over the Internet situation. (Brasher (1998), Vol. 2 at 138-45).

Following the August meeting, Cooke memorialized his understanding of the parties' discussions in a memorandum to Murray, Onigman, and Aguilar, outlining proposed terms of an "interactive distribution agreement" between Trotter and FitnessZone. (Doc. 113, Ex. G; Cooke (2001) (Ex. I2) at 16). The agreement stated, among other things, that (1) FitnessZone would sell

Trotter products at a maximum discount of 10%, other than to meet the price of another Trotter dealer and (2) FitnessZone would give 75% of the sales profit on out of territory sales to the dealer in the territory where the product was sold. (Doc. 113, Ex. G). Trotter never accepted the terms of the agreement. (Murray (1998) at 558-60; Brasher (1998) (Vol. 1) at 251-53; Gene Brasher (2002) (Ex. B3) at 43-45).[12] According to Brasher, he talked with Aguilar about getting together later to work out a couple of things. (Brasher (1998), Vol. 1 at 251).

On October 24, 1996, Aguilar wrote Brasher, detailing Trotter's position on the Internet. He stated, among other matters, that "Trotters [sic] policy for the Internet will be consistent for all dealers," "Trotter will establish [its] own website on the Internet," "Trotter will support The FitnessZone['s] promotion of Trotter products on their website as long as the products are promoted at list price," and FitnessZone will remit 75% of the profit on sales outside of Alabama to the local dealer. (Ex. 8).

Trotter continued to fill orders from FitnessZone until Trotter terminated FitnessZone's dealership on July 1, 1997. From January through June 1997, FitnessZone's purchases of Trotter equipment increased by approximately ninety-six percent from the same period in 1996. (Doc. 113, Ex. B, Ex. 6).

**G. The Brunos Invest in FitnessZone**

In September 1996, Charlie Bruno received a fifteen percent interest in FitnessZone in exchange for his guarantee of a $400,000.00 line of credit. (C. Bruno (Ex. C) at 18-19). He decided to invest because of FitnessZone's Internet activity. (*Id*. at 23-29). Michael Bruno,

---

[12] Brasher testified that the terms were merely a proposal to Trotter. (*Id*. at 43). He further states that Trotter never got back with them. (*Id*.). The memo states that a "final signoff of an official agreement" would be necessary. (Doc. 113, Ex. G or Ex. 9 at ¶ 15(a)).

following discussions with his brother Charlie, went to work at FitnessZone in October 1996.

(M. Bruno (Ex. D) at 12-13).  Paul Bruno became president of the company three months later in

January 1997.  (*Id*. at 18; P. Bruno (Ex. E) at 14-15, 20-23).  Vincent Bruno made a substantial

investment in the company in April 1997.  (V. Bruno (Ex. F) at 20-24).  Vincent Bruno also

invested in FitnessZone because of FitnessZone's Internet activity.  (*Id*. at 29-30).  After

September 1996, FitnessZone invested nearly a million dollars in T1 lines, trucks, inventory,

computers, advertising, and personnel to address their present growth and prepare for future

growth.  (Brasher (1998), Vol. 2 at 246-63).

### H.  FitnessZone's Termination

Trotter terminated FitnessZone on July 1, 1997.  (Ex. 12).  Trotter provided no

explanation for the termination to FitnessZone.  The termination letter references only a

"continuing evaluation" of Cybex's business needs following the merger with Trotter.  (*Id*.).

When Brasher asked Haberstroh for a reason, he simply stated that "Trotter felt like it was in

their best interest to cut [FitnessZone] off."  (Brasher (1998), Vol. 1 at 287).  Murray failed to

return Brasher's calls following the termination.  (*Id*. at 296).  When Paul Bruno contacted

Haines to inquire about keeping the Trotter line, Haines stated that he had deferred to "the boys,"

which Bruno understood to mean Murray and someone else at Trotter.  (P. Bruno at 253-54).

At the time of the termination, FitnessZone was among the top dealers of Trotter

equipment in sales volume.  (Murray (1998), Vol. 2 at 445).  Trotter had accounted for

approximately 40% of FitnessZone's revenues and 75% of its Internet sales.  (P. Bruno Dep. at

162).  Following the termination, FitnessZone began concentrating less on Internet sales and

more on opening retail stores.  (P. Bruno Dep. at 101-07; V. Bruno Dep. at 30-31).

Based on the calculations of its expert witness, FitnessZone asserts that it lost in excess of $1.8 million in profits because of Trotter's termination of it. (Doc. 113, Ex. B). In addition, FitnessZone asserts that it invested substantial sums of money developing its website in reliance on its ability to sell Trotter products over the internet. (P. Bruno Dep. at 111-15; Brasher I, Vol. 2 at 246-63).

FitnessZone did not adhere to the minimum pricing standards in the DPSP at the time of its termination. (P. Bruno at 74). Following FitnessZone's termination, Murray testified that dealers were generally complying with the pricing standards. (Murray (1998), Vol. 1 at 374-75).

### I. The Gym Source

The Gym Source has been an authorized Trotter dealer for more than fifteen years. (Miller at 5). According to Murray, Trotter's Director of Sales, the Gym Source was "Trotter's number one customer" in 1996. (Doc. 113, Ex. S). As such, according to the memorandum Murray sent to Richard Miller, its President, enclosing the standards, "it [was] vital to secure [Gym Source's] full support" for the guidelines contained in the program. (*Id.*).

Miller instructed his employees to "abide by the minimum pricing" when Trotter's dealer performance standards came out in 1996. (Miller at 9-10). Prior to this point, the Gym Source "charged whatever it took to make the sale." (*Id.* at 10). At this juncture, Trotter was Gym Source's "number one treadmill," accounting for fifteen percent of all of Gym Source's treadmill sales. (*Id.* at 12). Trotter "hassl[ed]" Miller to follow the pricing standards. (*Id.* at 26).

The Gym Source continued to abide by the pricing agreement until approximately December 1996. At that time, Miller wrote to Peter Haines, then Trotter's President, complaining that although the Gym Source was adhering to the pricing structure, other Trotter

18

dealers were not.  Miller stated in the letter to Haines that he had "made it a top priority company wide" to support the Trotter policy, and that his adherence to the policies had been with an eye to "establish[ing] consistency throughout [Gym Source's] territory." (Doc. 113, Ex. T).  He further stated that Trotter had "eroded [Gym Source's] profit margins, . . . inflicted insults upon us, turned a deaf ear to our needs and now are [sic] hindering our ability to properly compete." (*Id*.). Miller stated that his company was "losing sales . . . because . . . other people were selling the product at a cheaper price." (Miller at 30).  Miller also stated that, in his judgment, pricing was the "key issue" under the performance standards program. (*Id*. at 33).  Miller further stated that "if they were going to have a program, then everybody should play by the same rules, that's it. Everybody should follow the same thing." (*Id*. at 35).  Miller's letter to Haines concluded: "We are your number one purchaser in the world as well as advertiser, promoter and cash cow . . . .  As we exit a successful 1996 it is up to you to decide how we enter 1997." (Doc. 113, Ex. T).  Miller described the circumstances and his letter to Haines as follows: "I am abiding by what you asked me, trying to hold your line and instruct my people to.  But you have all these incidents going on, and either you enforce them or I am going to do something else." (Miller at 27).

**J. Nordic Fitness**

Marc Snowhite was the principal of Nordic Fitness in Houston, Texas, during this time. (Snowhite (Doc. 113, Ex. U) at 6).  According to Snowhite, Nordic Fitness "absolutely" complied with the pricing requirements. (*Id*. at 56).  The DPSP was put into place, according to Snowhite, "[t]o clean things up, per se, because of people selling at lesser pricing at that type of thing.  So to clean up the market, per se." (*Id*).

Snowhite was "absolutely" aware that other dealers were complying, just as he was.

(Snowhite at 56). It was important to Snowhite that Trotter dealers maintained "price integrity," as Snowhite put it, because to do so meant "larger profit margins for the dealers. . . . If everybody sells at the same price, again, I understand price fixing and all of that. But I also understand gentlemen's agreements among the dealers. I think that's important."
(*Id*. at 56-57).

FitnessZone sold Trotter products to customers that Nordic Fitness considered to be within its "territory," at prices that were "way below retail." (Snowhite at 9-10, 57). Snowhite complained about this to "everybody" at Trotter, "meaning our sales rep, which [he believed] was either Mike Aguilar or Paul Haberstroh, Roland Murray [(Director of North American Sales)], Peter Haines [(President)]." (*Id*.). Snowhite's complaint was that FitnessZone's pricing was undercutting Nordic Fitness' profits. (*Id*.). Snowhite had had reports from "lots" of other dealers that they were in fact abiding by the DPSP. (*Id*. at 14, 17). Upon receiving these complaints, Trotter personnel made statements to Snowhite like "we're working on it." (*Id*. at 34, 59). Haberstroh reported to Snowhite that some dealers "were selling below or were discounting, deep discounting." (*Id*. at 75). These complaints, according to Snowhite, "upset" Murray. (*Id*. at 73-75). Snowhite opined that Trotter terminated FitnessZone because of other dealers complaining about pricing issues. (*Id*. at 36).

According to Snowhite, Trotter was "very aware" of what Nordic Fitness charged for Trotter products, through visits to the Nordic Fitness store by its sales representatives. (*Id*. at 30, 54). Trotter representatives also inquired about whether Nordic Fitness was complying with the DPSP, and made inquiry as to what Nordic Fitness was charging. (*Id*. at 31-32). Snowhite talked with Haberstroh about such matters "over many lunches and dinners and visits to the

store." Murray also made similar inquiries. (*Id.* at 32). Snowhite stated that he believed he was agreeing to the standards by signing the "acknowledgment" form and returning it to Trotter. (*Id.* at 61-62, 71).

### K.  'N Shape

Jose Casanova was, during the relevant time, a fifty percent owner and a vice-president of 'N Shape Equipment Sales. (Casanova at 9).  Casanova testified that it was important that the other dealers price their equipment according to DPSP standards, thereby allowing the best salesman to get the deal.  He further stated, "If the price is not – there's going to be regulations and there's going to be a certain way to do it.  If everybody is not playing by the same rules, somebody gets hurt." (*Id.* at 85).  He believed that FitnessZone was not playing by the rules. Haberstroh told Casanova that 'N Shape ought to abide by the pricing DPSP and that "he didn't see any reason why we should not be honoring them because there were others that were." (*Id.* at 84-85).

Casanova also testified that 'N Shape was required to submit a "forecast" of all its commercial deals to Trotter.  The forecast was completed on a spreadsheet and faxed to Trotter on a monthly basis.  The spreadsheet contained the name of the company to whom 'N Shape was trying to make a sale (including address and phone number), what equipment was being sold, the dollar value of the deal, and "percentage to close" (or how close, expressed as a percentage, that 'N Shape was to closing the deal). (Casanova at 36).  'N Shape also enumerated the price it was quoting to the customer premised on a request. (*Id.* at 36-37).  'N Shape was ordered to undertake this exercise by its Trotter representative, Paul Haberstroh. (*Id.* at 38-39).

Casanova received the dealer performance standards at approximately the time frame they

were published, April 1996. (*Id*. at 40). Haberstroh shortly thereafter came to Birmingham to meet with Casanova to "go over" the standards. (*Id*.). The standards marked a new way of doing business for 'N Shape. Prior to their issuance, 'N Shape had always sold Trotter products and Trotter had never before required the "forecasts" that became a part of what 'N Shape had to do every month. (*Id*. at 41). Haberstroh, in explaining the new standards, advised Casanova that adherence to the standards was going to be required, or termination would result. (*Id*. at 44). Casanova responded that "if I'm going [to] follow this, everybody else better be." (*Id*.). Haberstroh assured him that "everybody would be following it." (*Id*.). Haberstroh explained that 'N Shape would have to sell at the prices contained in the standards, "otherwise, we would be in violation." (*Id*. at 45). Prior to the performance standards program, there had never been an insistence by Trotter on particular retail pricing, and 'N Shape had always set its own prices before this time. (*Id*. at 46).

'N Shape was feeling the impact of FitnessZone's website activity shortly after FitnessZone launched its site. 'N Shape noticed that its sales were going down. (Casanova at 48). Casanova discussed this with Haberstroh. 'N Shape's complaint was that "we would have a customer that we were going to sell to and they would look it up on the [I]nternet and FitnessZone's price was so far reduced it would cut the bottom out of it and you would lose the deal." (*Id*. at 49). Haberstroh told him that Trotter and FitnessZone had "a deal" with regard to FitnessZone's [I]nternet site and that Trotter was "trying to get around it, . . . trying to get it terminated." (*Id*. at 51-52, 57).

### L. Other Dealers

Another Trotter dealer, The Xercise Store, Inc., stated on its executed acknowledgment

form, "We are signing this document because we feel a program must be enforced for the well being of those dealers who do maintain their margin. . . . We know who we are dealing with and know that they will be able to easily dance around this program in the upcoming season. . . . therefore take the steps necessary to take control of the pricing problems." (Doc. 113, Ex. N).

Another Trotter dealer, Fitness Lifestyles, executed its acknowledgment form, stating, "Great Idea!  Good to see your [sic] making an atempt [sic] to bring back the price." (*Id*. at Ex. O).

A memo from Murray to John Potts of Fitness Shop references their discussion of "an attempt to raise the standards of pricing throughout all markets . . . ." (*Id*. at Ex. P).

Doug Kortemeyer, of Fitness Equipment, Inc., another Trotter dealer, wrote Murray in a June 10, 1996 letter that FitnessZone was discounting Trotter equipment on the Internet.  He was "most interested in what [Murray's] positions and actions will be on this." (*Id*. at Ex. Q).

## M. True Fitness

FitnessZone also was involved about this time with True Fitness (hereinafter "True"), another fitness equipment company.  True also had geographic territories for its dealers, based on the area in which the dealers could effectively service True products.  (Scott Eyler (Ex. M) at 25). A True dealer typically would not service a product that it did not sell.  (*Id*. at 33-34).  True had a policy that its warranty did not apply if a True-authorized dealer did not assemble the product. (*Id*. at 38-39).  FitnessZone began selling True products nationwide on its website in about mid-1996 without asking for True's permission before doing so.  (*Id*. at 19-20, 23-24).  True began receiving dealer and customer complaints about FitnessZone's extra-territorial sales, free-riding, and "orphaned" products.  (*Id*. at 22, 45, 61-62).  Customers were complaining that

23

the dealers did not service what they sold and that they (the customers) were told by FitnessZone that the warrant policy was illegal. (*Id.* at 38-39, 72-73).

Scott Eyler, True's Vice President of Sales and Marketing, met with Brasher in July 1996 to discuss the problems Brasher's nationwide Internet sales were creating. (Eyler at 6, 18). When Brasher did not change his sales practices, True notified him on January 29, 1997, that True would no longer do business with FitnessZone, effective thirty days from that date. (Ex. 10; Eyler at 75). Brasher then contacted True in an effort to be reinstated. (Eyler at 75).

On March 4, 1997, Brasher entered into a written agreement with True, whereby he would be reinstated as a True dealer, and in return, he agreed to, among other things, a requirement that he not actively market True products outside a 100-mile radius of Birmingham. (Ex. 11). FitnessZone never complied with this agreement; it continued to sell True products nationwide and it continued to "drop-ship" True products all over the country. (Eyler at 84). True terminated Brasher, and FitnessZone, for good on June 3, 1997, one month prior to the Trotter termination. FitnessZone has acknowledged that True sales were a substantial portion of its business at the time. (V. Bruno at 97).

## III. STANDARD OF REVIEW

The parties agree that the usual Rule 56 standards apply to the state law claims.[13] They

---

[13] The usual summary judgment standard is as follows:

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate

disagree as to the standard to be applied on the antitrust claims. The plaintiff asserts that it need only establish a genuine issue of material fact regarding the existence of a conspiracy which led to its termination to survive the defendant's motion for summary judgment on the § 1 claim. (Doc. 103 at 22). The defendant asserts, "'[T]he Supreme Court has articulated specific rules which make summary judgment a good deal more easily available to dismiss claims of antitrust conspiracy in violation of Sherman Act § 1.' *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1012 (2nd Cir. 1989)." (Doc. 103 at 15).

In *Jeffers Vet Supply, Inc. v. Rose America Corp.*, 75 F. Supp. 2d 1332, 1335 (M.D. Ala. 1999), Chief Judge Albritton stated as follows:

> According to the Eleventh Circuit, summary judgment in cases claiming "antitrust violations arising out of allegations that a distributor was terminated because it failed to adhere to an illegal resale price agreement" requires a modified standard. *Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*,

---

burden of proof. *Celotex*, 477 U.S. at 322-23; *See* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 259. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

The court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury and, therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from the undisputed facts, then a court should deny summary judgment." *Allen v. Tyson Foods*, 121 F.3d 642 (11th Cir. 1997).

818 F.2d 1530, 1532 (11th Cir. 1987) ("*Helicopter*"). The Eleventh Circuit, in the *Helicopter* case, incorporated the Supreme Court holdings of *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), and created what is known as the "*Helicopter* test" for summary judgment. This test was followed in the *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1508-09 (11th Cir. 1989) ("The summary judgment standard in vertical restraint cases is more stringent than in other areas of antitrust law because a higher possibility of capturing and invalidating legitimate business conduct exists."), and has remained the test used to analyze summary judgment in manufacturer and dealer claims under § 1 of the Sherman Act in the Eleventh Circuit.

The issues of material fact which must exist in order to survive summary judgment are whether a conspiracy to fix prices existed and whether the dealer was terminated pursuant to that conspiracy. *DeLong*, 887 F.2d at 1508.

According to the *Helicopter* test, in order to establish that such fact issues exist the plaintiff must (a) "satisfy the court that the conspiracy which he alleges is, objectively, an economically reasonable one" and (b) produce "evidence which tends to exclude the possibility that the manufacturer was operating independently in making his determination to terminate the distributor." *Helicopter*, 818 F.2d at 1534. The Supreme Court had stated earlier that to prove an agreement to restrain trade in a dealer termination case the plaintiff must produce "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768, 104 S. Ct. 1464.

In *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414 (11th Cir. 1990), another

§ 1 antitrust case, the defendants asserted that the applicable standard to be applied on summary

judgment is more stringent than usual. Rejecting this contention, the court stated:

Our analysis on summary judgment was based on a normal reading of the Rule 56 standard. Appellees argue that our analysis should have been based on a stricter reading. They assert that the Supreme Court's decision in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), evinces a mandate for courts to use a stricter-than-normal summary judgment standard in antitrust cases, a standard that imposes extra burdens on a plaintiff, one that would lead us in this case to uphold the district court. We cannot agree with the Appellees' assertion, however, for *Matsushita* calls for no such deviation from the norm embodied in Fed. R. Civ. P. 56.

>    In *Matsushita* the Supreme Court warned courts in summary judgment
> proceedings to be skeptical when presented antitrust allegations that clash with
> established economic theory.  Such skepticism is well warranted because
> established economic theory indicates how rational entities generally act, and
> most antitrust cases involve the acts of rational entities.  Generalizing, *Matsushita*
> warns courts to be wary of drawing irrational inferences in summary judgment
> proceedings, for irrational inferences fail to create genuine issues of material fact.
> But such a doctrine is hardly novel; and it certainly does not modify the standard
> for summary judgment.  *Matsushita* said nothing new, it merely informed the
> proper Rule 56 standard by placing it in a complex antitrust context (that of a
> predatory pricing conspiracy).
>
>    We did not base our conclusions on irrational inferences, of course.  Thus,
> *Matsushita* provides Appellees with little help.

*Alan's of Atlanta*, 903 F.2d at 1430 n.22.

In resolving the motion as to the plaintiff's § 1 claim, the court will apply the standard set

forth by the Eleventh Circuit in the *Helicopter* case.  Even if the court had applied the usual Rule

56 analysis on this claim without reference to the *Helicopter* test, the result would be the same.

## IV.  PLAINTIFF'S ANTITRUST CLAIMS

### A.  Section One Claim

Count One alleges that Trotter participated in a scheme to fix prices and restrict

geographical territories, in violation of § 1 of the Sherman Act.  *See* 15 U.S.C. § 1.[14]  The

defendant asserts that it is entitled to summary judgment on the plaintiff's claims.  (Doc. 103 at

---

[14] Section One of the Act provides:

**Trusts, etc., in restraint of trade illegal; penalty**

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or
> commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall
> make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed
> guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a
> corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said
> punishments, in the discretion of the court.

15 U.S.C. § 1.

16).  The plaintiff conceded the motion for summary judgment insofar as it relates to the assertion that Trotter improperly restricted geographical territories, "agreeing that this case is about price-fixing and not territorial restrictions."  (Doc. 113 at 22 n.5).  Accordingly, the defendant's motion for summary judgment is due to be granted as to this portion of the plaintiff's § 1 claim.  The court will, therefore, only address the defendant's motion to the extent it concerns the plaintiff's price fixing allegations under § 1.

The defendant asserts numerous failures concerning the price fixing claim.  Each will be addressed separately.

### 1.  Failure to Prove the Necessary Elements

In *Griffiths v. Blue Cross and Blue Shield of Alabama*, 147 F. Supp. 2d 1203, 1209-10 (N.D. Ala. 2001), the court stated:

> There are three essential elements of a Section 1 violation: (1) joint or concerted action between more than one party that (2) unreasonably restrains trade in (3) interstate commerce. *American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996); *R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc.*, 807 F.2d 1222, 1224 (5th Cir. 1987).  In addition, even if a plaintiff has alleged sufficient facts comprising a Sherman Act violation, in order to recover damages or injunctive relief therefor under the Clayton Act, a complaint must also allege an actual or threatened "antitrust injury" to [the p]laintiffs. *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1452 (11th Cir. 1991). That is, in order to recover damages under section 4 of the Clayton Act, 15 U.S.C. § 15, [ ] it must appear that [the p]laintiffs have suffered an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful,'" *MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1279 (11th Cir. 1999) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)), or that such injury is threatened to [the p]laintiffs, so as to allow an award of injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26.[] *Todorov, supra.*

*Griffiths*, 147 F. Supp. 2d 1209-10 (footnotes omitted).

The defendant contends that the plaintiff cannot demonstrate that (1) there was a

conspiracy to fix prices, (2) it was terminated as a result of any conspiracy, and (3) it suffered an injury as a result of the termination. (Doc. 103 at 18).

### a. Conspiracy to fix prices

The United States Supreme Court has stated that "Section 1 of the Sherman Act requires that there be a 'contract, combination . . . or conspiracy' between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S. Ct. 465, 468, 63 L. Ed. 992 (1919); *cf. United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S. Ct. 503, 4 L. Ed. 2d 505 (1960)." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S. Ct. 1464, 1469, 79 L. Ed. 2d 775 (1984). The issue before this court is whether the evidence sufficiently shows actual concert of action between the defendant and at least one other person or entity to overcome the motion for summary judgment. The evidence, as in any conspiracy, may be either express or circumstantial. *DeLong Equipment Company v. Washington Mills Abrasive Company*, 887 F.2d 1499, 1515 (11th Cir. 1989). In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the Supreme Court stated as follows:

> . . . . [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.*, at 764, 104 S. Ct., at 1470. *See also Cities Service*, *supra*, 391 U.S., at 280, 88 S. Ct., at 1588. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S., at 764, 104 S. Ct., at 1471. Respondents in this case, in other words, must

> show that the inference of conspiracy is reasonable in light of the competing
> inferences of independent action or collusive action that could not have harmed
> respondents. *See Cities Service, supra,* 391 U.S., at 280, 88 S. Ct., at 1588.

*Matsushita,* 475 U.S. at 588, 106 S. Ct. at 1356-57.  See also *Jeffers,* 75 F. Supp. 2d at 1335.  As

noted above, the Eleventh Circuit has stated that the antitrust plaintiff must show that the

conspiracy is an economically reasonable one and that the evidence "tends to exclude the

possibility that the manufacturer was operating independently in making his determination to

terminate the distributor." *Helicopter,* 818 F.2d at 1534.

   As to the first prong, the defendant does not attempt to argue that a minimum price fixing

agreement would be economically unreasonable.  The court agrees with the plaintiff that a

minimum pricing conspiracy is exactly what § 1 is intended to prohibit.  By setting and adhering

to minimum pricing, the defendants would benefit in a manner not otherwise intended by free

market concepts.  It would allow the participants to attain more profits than would normally be

available in a competitive market.  Such conduct, therefore, ultimately would inure to the

detriment of consumers.

   Trotter challenges the plaintiff's claim under the second prong, questioning the

sufficiency of the plaintiff's evidence of a conspiratorial agreement or understanding.  In sum, it

asserts that the plaintiff has not presented evidence which "tends to exclude the possibility that

[Trotter] and nonterminated distributors were acting independently." *Monsanto,* 465 U.S. at 764.

### i. DPSP is inconsistent with notion of a price fixing agreement

   The defendant initially asserts that the DPSP agreement is not sufficient evidence of a

conspiracy to support the *Monsanto* standard.  (Doc. 103 at 20).  Trotter specifically states that

"the DPSP does not require dealers to sell at a particular price; it simply 'encourages' dealers to

charge certain prices.  Moreover, the DPSP does not ask dealers to communicate to Trotter their

acceptance of Trotter's suggested prices, a prerequisite under *Monsanto*; the acknowledgment

form asks dealers to communicate only that they have received the document."  (*Id.* at 20-21).

Trotter further states that "the DPSP 'requests that authorized dealers . . . not provide information

concerning other authorized dealers' pricing, marketing or other trade practices'" and it

"expressly states that it is not a contract or agreement, and that all termination decisions 'are in

Trotter's sole, complete and unilateral discretion.'"  (*Id.* at 21).  The plaintiff counters that the

DPSP is intended as a minimum pricing restriction and Trotter requested that its dealers comply

with those restrictions.  (Doc. 113 at 26).

   The DPSP document alone is not sufficient to demonstrate a price-fixing conspiracy.  The

DPSP language "encourages" dealers to maintain certain prices.  (Doc. 113, Ex. C at 2).  It does

not mandate that the discount percentages must be followed.  Similarly, the fact that the DPSP

includes an acknowledgment form to be signed by the dealers, showing that they have received

the same, also is not, in and of itself, sufficient to demonstrate the existence of a conspiracy.

   The defendant also asserts that the language in the DPSP which provides (1) it is not

necessary for dealers to "provide information concerning other authorized dealers' pricing,

marketing or other trade practices" to Trotter; (2) "Trotter's actions concerning its authorized

dealers are undertaken unilaterally and not at the request of other authorized dealers;" and (3) the

standards are not a contract or agreement, evidences the lack of a conspiracy.  Just as the

acknowledgment does not demonstrate a conspiracy, this language alone is not sufficient to

refute the existence of a conspiracy so as to warrant the granting of the defendant's motion for

summary judgment.  (*Id.* at 2-3).  The DPSP and the acknowledgment form are simply part of the

overall evidence that the court must consider in resolving the motion.[15]

### ii. Sales practices are inconsistent with notion of price fixing agreement

The plaintiff asserts that the actions of Snowhite, Miller, and Casanova are demonstrative of the illegal conspiracy. (Doc. 113 at 27). The defendant asserts that this evidence is insufficient for various reasons.[16] (Doc. 103 at 21-26; Doc. 114 at 4-10).

Regarding Snowhite and his company, Nordic Fitness, the plaintiff asserts that the evidence shows (1) that he (Snowhite) "had an agreement with Trotter that [he] would not sell Trotter products at a discount greater than the discount set out in [the Dealer Performance Standards]" (Snowhite at 71);[17] (2) "that he was 'absolutely' aware that other dealers were complying, just as he was" (doc. 113 at 27, citing Snowhite at 71); and (3) that he was aware of the importance of maintaining "price integrity" because that meant larger profit margins for the dealers. (Id.).

There is no direct evidence of a conspiratorial agreement in Snowhite's deposition testimony. He did state that it was his practice and policy to sell Trotter equipment at the retail

---

[15] The court also notes that the evidence, at least in part, shows that the DPSP was a consequence of dealer complaints about pricing. (See Haberstroh at 79-80; Doc. 113, Ex. I). Snowhite stated that it was put into place "[t]o clean things up, per se, because of people selling at lesser pricing at that type of thing. So to clean up the market, per se." (Snowhite at 56).

[16] The defendant also states that 'N Shape is the only dealer named as being part of the alleged price-fixing conspiracy. (Doc. 103 at 22). Although this is correct, the amended complaint also alleges that "certain other dealers" were involved in the conspiracy. (Doc. 23 at ¶ 21). The court finds this sufficient to allow consideration of this evidence.

The defendant further states that "*Monsanto* is clear . . . that dealer complaints are virtually meaningless." (Doc. 103 at 21). The court disagrees. The Supreme Court in *Monsanto* stated as follows:

> We do not suggest that evidence of complaints has no probative value at all, but only that the burden remains on the antitrust plaintiff to introduce additional evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy.

*Monsanto*, 465 U.S. at 764, 104 S. Ct. at 1471. The Court did note, "Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct." *Id.* at 763.

[17] FitnessZone premises this argument upon Snowhite's signing of the DPSP. (Doc. 113 at 27).

prices. (Snowhite at 19). The sales invoices before the court, however, show that Nordic Fitness did on occasion sell Trotter equipment at a discount. (Ex. 16 compared to Ex. 1).[18] The invoice evidence, however, does not refute sufficiently the plaintiff's conspiracy allegations. If anything, it raises credibility issues regarding Snowhite's testimony that are not appropriate for summary judgment. Although Snowhite stated that Nordic Fitness complied with the pricing requirements of the DPSP (Snowhite at 56) and that he was aware that other dealers were complying (*id.*), he also stated that it was academic to him because he was selling his equipment at retail prices (*id.* at 19). If the court accepts this testimony, it does not necessarily support a finding of concerted action by Nordic Fitness and Trotter. According to Snowhite, Nordic Fitness was acting as it did before the DPSP premised on Snowhite's direction and not necessarily pursuant to any agreement with Trotter. The fact that this supported a common interest is not alone evidence of a conspiracy. It alone does not "'tend[ ] to exclude the possibility' that the alleged conspirators acted independently." (*Matsushita*, 475 U.S. at 588 (citing *Monsanto*, 465 U.S. at 764, 104 S. Ct. at 1471). However, the court is troubled by Snowhite's overall testimony, including (1) that he understood "price fixing and all of that," but he also "understand[s] gentleman's agreements among the dealers" (Snowhite at 56-67);[19] (2) that he talked numerous times with Haberstroh

---

[18] The defendant has submitted four invoices for the court's consideration. Two are nearly impossible to discern what equipment was sold or the price charged, however, the court has been able to identify the following: (1) a December 1997 invoice demonstrates that Nordic Fitness sold four "640" Treadmills at what appears to be about a 22% discount; (2) a March 29, 1996 invoice demonstrates that Nordic sold a "510" Treadmill for what appears to be about an almost 40% discount; and, (3) an April 7, 1997 invoice demonstrates that Nordic sold a "545" Treadmill for what appears to be about a 42% discount. (Ex. 1 & 16).

[19] The fact that Snowhite was aware that others were complying with the DPSP and that the results of such compliance would lead to "price integrity," alone fails to support the finding that there was a conspiracy.

about such matters (*id.* at 32);[20] and (3) he believed that he was agreeing to the standards by signing the "acknowledgment" form and returning it to Trotter (*id.* at 61-62, 71). This evidence in the overall context of this case tends to exclude the possibility that the defendant acted independently. In fact, it demonstrates that the defendant was acting conspiratorially. In *Monsanto*, the Supreme Court stated:

> The concept of "a meeting of the minds" or "a common scheme" in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.

*Monsanto*, 465 U.S. at 764 n.9. The foregoing evidence shows for purposes of this motion that the *Monsanto* standard has been met. In sum, it presents a factual question for a jury.[21]

---

[20] The fact that Snowhite complained to Trotter that FitnessZone's pricing was undercutting Nordic Fitness's profits does not, in and of itself, overcome the defendant's motion for summary judgment. However, the defendant's reply that it was working on the problem, coupled with the evidence including the various discussions about compliance, are sufficient along wiht the other evidence before the court to overcome the motion for summary judgment on this claim.

[21] In *Helicopter*, a distributor alleged that Hughes, a manufacturer of helicopters and helicopter parts, and its overseas distributors violated § 1 by conspiring to fix overseas prices. It further alleged that it was terminated because it undersold other distributors. The Eleventh Circuit, in reversing the trial court's grant of summary judgment, found that there was "direct evidence of an agreement between Hughes and its foreign distributors to maintain resale prices." *Helicopter*, 818 F.2d at 1536. The court stated that this evidence tended to exclude the possibility that Hughes was acting independently. *Id.* The evidence consisted of Hughes' international dealership agreement that provided that " the suggested price lists and schedule of discounts may be amended, altered, or modified from time to time, and . . . will be binding on Distributor upon notification in writing." *Id.* The court concluded that "this provision indicates that the distributor and Hughes have agreed to fix resale prices for Hughes parts overseas" and Hughes' explanation was "implausible [ ] at worst, and at best, a reasonable trier of fact might disagree and draw from this agreement the inference that Hughes and its overseas distributors had agreed to fix resale prices in violation of the antitrust laws. *Id.* (footnote omitted). Additionally, the evidence on causation showed Hughes threatened to terminate the dealer, it requested that the discounting distributor stop its discounting practices, and that Hughes franchised another dealer in the plaintiff's area in retaliation. *Id.* at 1536 n.10. In *dicta*, the court also stated the following regarding the district court's analysis of "mere complaints:"

> The district court reviewed a series of communications between Hughes and one of its overseas distributors and determined that these reflected nothing more than mere complaints. The district court's analysis, however, did not give full credit to the reasonable inferences which might have been drawn from the communications. The first telex from Derek Graham, Hughes' English distributor, to George Hurd, a Hughes executive, simply copies one of HSS' overseas discount price fliers and indeed amounted to nothing more than a mere complaint about HSS' pricing policy. . . . Thereafter, however, Hurd replied: "Please be advised that corrective action has been taken regarding the U.S. service center offering discounted parts on the international market. Hopefully, the problem is resolved but should it recur please advise us." *Id.* Finally, Graham responded: "Thank you for your prompt action in respect of the pirate spares supplier." *Id.*

> These communications reflect something more than mere complaints. There was not merely a

Regarding Miller, the evidence shows that his company, the Gym Source, was a long-time Trotter dealer and, in 1996, was its "number one customer." (Doc. 113, Ex. S). Because of the Gym Source's prominence, Murray wrote Miller that "it [was] vital to secure [Gym Source's] full support" for the guidelines contained in the program. (*Id.*). Miller accepted the DPSP and instructed his employees to "abide by the minimum pricing," which was a departure from his previous practice. The Gym Source abided by the pricing agreement until approximately December 1996, when Miller wrote Haines, complaining that other Trotter dealers were not adhering to the DPSP. Miller specifically complained that while he had "made it a top priority company wide" to support the Trotter policy, he had not received the support he expected from Trotter. Instead, he asserted, Trotter had "eroded [the Gym Source's] profit margins, . . . inflicted insults upon us, turned a deaf ear to our needs and now are [sic] hindering our ability to properly compete." (*Id.*). Miller stated that his company was "losing sales . . . because . . . other people were selling the product at a cheaper price." (Miller at 30). Miller concluded his letter by placing the burden on Trotter to decide what further action was appropriate. Miller testified that after December 1996, he went back to discounting Trotter equipment the way he had before the DPSP because he never received any response to his letter from Trotter. This included discounting Trotter equipment in excess of 20%, as stated in the DPSP. (Miller at 27-28, 48-49).

---

complaint and corrective action. In addition, Hughes advised Graham that corrective action has been taken and requested that Graham report any future violation. A jury could reasonably infer that this constituted an assurance to Graham by Hughes that it would similarly correct any future violations that Graham might report. Graham's "thank you" response creates a reasonable inference of Graham's agreement to report future violations.

    We need not decide, however, whether the foregoing evidence would be sufficient by itself to satisfy the stringent test, [ ] because the record in this case includes direct evidence of an agreement between Hughes and its foreign distributors to maintain resale prices. . . .

*Helicopter*, 818 F.2d at 1535-36 (footnote omitted). Because it is factually inapposite, this discussion has no precedential value in the present analysis.

35

Even if the court were to assume, for purposes of this analysis, that Miller and the Gym Source were coconspirators for a period, the undisputed evidence is that the conspiracy ceased to exist, at least as to them, in January 1997. This is over six months before FitnessZone was terminated. The court finds that this evidence alone is insufficient to support a jury finding that either Miller or the Gym Source was a conspirator at or about the time of the termination.

Regarding Casanova, the evidence shows that he was aware of the importance of pricing standards. Casanova and 'N Shape agreed to abide by the DPSP. 'N Shape was required by Haberstroh to submit "forecasts" of its commercial deals to Trotter. (Casanova at 38-39, 41). Haberstroh told Casanova that adherence to the standards was going to be required, or termination would result. (*Id*. at 43-44). Casanova responded that "if I'm going [to] follow this, everybody else better be." (*Id*. at 44). Haberstroh assured him that "everybody would be following it." (*Id*.). Haberstroh further explained that 'N Shape would have to sell at the prices contained in the standards, "otherwise, we would be in violation." (*Id*. at 45). According to Casanova, prior to the performance standards program, there had never been an insistence by Trotter on particular retail pricing, and 'N Shape had always set its own prices. (*Id*. at 46).

Premised on a review of the invoices in the record showing 'N Shape sales of Trotter treadmills, the court has determined that from December 12, 1996, through December 5, 1997, 'N Shape sold Trotter treadmills with discounts of between 20.8% and 39%.[22] (Ex. 13). Thus, the pertinent question is whether 'N Shape could be discounting treadmills below the DPSP percentages and still be acting in concert with Trotter in violation of § 1. The plaintiff argues that it can. It cites to *Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.*, 94 F.3d 1032 (6th Cir.

---

[22] The court notes that a number of the transactions did not include sales tax or shipping (freight) charges. (Ex. 13).

1996), stating that the fact "that a manufacturer 'may permit others to do limited discounting does not . . . preclude a finding that there was a conspiracy to fix prices in this case. . . .'" (Doc. 113 at 29 n.8 (citing *Ezzo's*, 94 F.3d at 1035)). *Ezzo's* is distinguishable because in that case, the manufacturer was knowledgeable of the "limited discounting" and permitted the same. In the present case, there is no evidence that Trotter was aware of and approved the discounting at the time it occurred. The court finds that this evidence does not support a finding that the evidence "tends to exclude the possibility" that they were acting independently. *Monsanto*, 465 U.S. at 764.

The defendant further asserts that even if the evidence shows that there was a conspiracy between Trotter and 'N Shape, it was concluded well in advance of FitnessZone's termination. Casanova testified that he followed the DPSP for seven or eight months after it was initiated. (Casanova at 178, 182). However, by early 1997, he was no longer following the same. (*Id.*). This testimony is consistent with the invoices referenced above. On December 12, 1996, 'N Shape sold a "Trotter 510" treadmill at a 25.5% discount.[23] (Ex. 13). Another December 12, 1996, sales invoice shows that 'N Shape sold a "Trotter 535" treadmill at a 26.2% discount.[24] (*Id.*). A May 30, 1997, sales invoice shows that 'N Shape sold a "Trotter 640" treadmill at a 25.02% discount.[25] (*Id.*). A June 24, 1997, sales invoice shows that 'N Shape sold a "Trotter

---

[23] This is based on the Trotter Price list of $3,595.00; a sale price of $2,680.55 as listed. (Ex. 13). The invoice indicates a total cost of $2,895.00. (*Id.*). If the final invoice cost is used, instead of the sales price, the discount is 19.5%.

[24] This is based on the Trotter Price list of $4,195.00 and a sales price of $3,095.00. (Ex. 13). This invoice also included a $150.00 shipping charge. (*Id.*). If this is added, the percentage discount is 22.6%.

[25] This is based on the Trotter Price list of $5,995.00 and a sales price of $4,495.00. (Ex. 13). This invoice also includes a $150.00 shipping charge. (*Id.*). If this is added, the percentage discount is 19.02%.

535" treadmill at a 33.25% discount.[26]  (*Id.*).  A July 30, 1997, sales invoice shows that 'N Shape

sold a "Trotter 510" treadmill at a 20.72% discount.[27]  An August 16, 1997, sales invoice shows

that 'N Shape sold a "Trotter 510" treadmill at a 27.67% discount.[28]  An August 18, 1997, sales

invoice shows that 'N Shape sold a "Trotter 535" treadmill at a 22.12% discount.[29]  A September

5, 1997, sales invoice shows that 'N Shape sold a "Trotter 510" treadmill at a 20.72% discount.[30]

A September 16, 1997, sales invoice shows that 'N Shape sold a "Trotter 535" treadmill at a

23.83% discount.[31]  An October 13, 1997, sales invoice shows that 'N Shape sold a "Trotter 535"

treadmill at a 38.14% discount.[32]  An October 16, 1997, sales invoice shows that 'N Shape sold

two "Trotter 510" treadmills at a 27.8% discount.[33]  A November 24, 1997, sales invoice shows

that 'N Shape sold a "Trotter 640" treadmill at a 23.43% discount.[34]  A November 28, 1997, sales

-----

[26] This is based on the Trotter Price list of $4,195.00 and a sales price of $2,800.00.  (Ex. 13).  This invoice also includes no sales tax.  (*Id.*).

[27] This is based on the Trotter Price list of $3,595.00 and a sales price of $2,850.00.  (Ex. 13).

[28] This is based on the Trotter Price list of $3,595.00 and a sales price of $2,600.00.  (Ex. 13).  This invoice also includes $208.00 in sales tax.  (*Id.*).  If this is added, the percentage discount is 21.89%.

[29] This is based on the Trotter Price list of $4,195.00 and a sales price of $3,267.00.  (Ex. 13).  This invoice also includes a $150.00 shipping charge.  (*Id.*).  If this is added, the percentage discount is 19.02%.

[30] This is based on the Trotter Price list of $3,595.00 and a sales price of $2,850.00.  (Ex. 13).

[31] This is based on the Trotter Price list of $4,195.00 and a sales price of $3,195.00.  (Ex. 13).

[32] This is based on the Trotter Price list of $4,195.00 and a sales price of $2,595.00.  (Ex. 13).  This invoice also includes $207.60 in sales tax.  (*Id.*).  If this is added, the percentage discount is 33.19%.

[33] This is based on the Trotter Price list of $3,595.00 each for two and a total sales price of $5,190.00 for two.  (Ex. 13).  This invoice also includes a $395.00 freight charge and $1,284.88 in sales taxes on all the equipment (7 pieces).  (*Id.*).  If the proportional amount is added to this equipment, the percentage discount is approximately 21%.

[34] This is based on the Trotter Price list of $5,995.00 each and a sales price of $4,590.75 each.  (Ex. 13).  This invoice also includes a $745.00 freight charge.  (*Id.*).  The court did not figure in a proportional share of the shipping charge because of the difficulty in doing so because of the amount and diversity of the equipment sent.

invoice shows that 'N Shape sold two "Trotter 510" treadmills at a 22% discount.[35]  Finally, a

December 5, 1997, sales invoice shows that 'N Shape sold a "Trotter 510" treadmill at a 27.81%

discount.[36]

     This evidence is unrefuted in the record.  It clearly demonstrates that even if the court

were to find that Casanova and 'N Shape were coconspirators during 1996, any conspiratorial

agreement or understanding ceased to exist by at least early 1997, well before FitnessZone was

terminated.  'N Shape consistently discounted Trotter equipment by more than the 20%

delineated in the DPSP.  The Casanova evidence alone is not sufficient to support the plaintiff's

conspiracy claim and to overcome the motion for summary judgment.

     Even if it were argued that 'N Shape failed to communicate its withdrawal from the

conspiracy to Trotter and that it is therefore still a coconspirator, the court finds that the

plaintiff's evidence would not "tend[ ] to prove that [Trotter] and ['N Shape] had a conscious

commitment to a common scheme designed to achieve an unlawful objective" at the time

FitnessZone was terminated.  *Monsanto*, 465 U.S. at 768, 104 S. Ct. 1464.  To find otherwise

would require this court to delve into speculation.  Thus, the court finds the Casanova evidence

alone insufficient to support a conspiracy claim at the time of the termination.

     Summary judgment is due to be granted on this count but for the totality of the evidence

discussed above, particularly that concerning Snowhite.  The court also notes that the 'N Shape

evidence demonstrates the existence of a conspiracy at least until about December 1996.

---

[35] This is based on the Trotter Price list of $3,595.00 and a sales price of $2,794.00, each.  (Ex. 13).  This invoice also includes $726.24 in sales tax for all the items purchased.  (*Id.*).  If a proportional share is added, the percentage discount is 16.07%.

[36] This is based on the Trotter Price list of $3,595.00 and a sales price of $2,595.00.  (Ex. 13).  This invoice also includes a $495.00 freight charge and $760.80 in sales tax for all the items purchased.  (*Id.*).  If a proportional share of the freight and sales tax is added, the percentage discount is 18.6%.

In sum, the overall evidence is legally sufficient to submit this claim to a jury for a determination of whether the defendant's action in terminating FitnessZone was an act in furtherance of a conspiratorial agreement.

### b. Termination not because of price fixing conspiracy

The defendant next asserts that it is entitled to summary judgment because the plaintiff cannot exclude the possibility that its termination was for reasons other than its failure to abide by the alleged price-fixing agreement. (Doc. 103 at 26). The plaintiff counters that it is not required to rebut all the purported justifications for termination offered by the defendants. (Doc. 113 at 32-33). It further states that "given the substantial evidence of a price fixing agreement in this case, and the conflicting evidence as to other possible reasons for the termination, it is [within the] province of the jury to determine the true reason for FitnessZone's termination." (*Id.* at 40 (footnote omitted)).

The Third Circuit has articulated the applicable considerations when a defendant offers reasons for its actions as follows:

> . . . . [T]he *Matsushita* Court did not hold that an antitrust defendant is entitled to summary judgment merely by providing an economic theory to justify its behavior. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, ----, 112 S. Ct. 2072, 2083, 119 L. Ed. 2d 265 (1992) ("The [*Matsushita*] Court did not hold that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment." (emphasis in original)); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990) ("Nor do we think that *Matsushita* and *Monsanto* can be read as authorizing a court to award summary judgment to antitrust defendants whenever the evidence is plausibly consistent with both inferences of conspiracy and inferences of innocent conduct."), *cert. denied*, 500 U.S. 959, 111 S. Ct. 2274, 114 L. Ed. 2d 725 (1991). Instead, the Court simply stressed that to survive summary judgment in the absence of direct evidence or strong circumstantial evidence of an agreement, a plaintiff must assert a theory that is plausible. *Matsushita*, 475 U.S. at 593-94, 106 S. Ct. at 1359-60. In this respect, then, *Matsushita* did not invent a

new requirement for an antitrust plaintiff to meet, but merely articulated an established one, *i.e.*, the inferences drawn from the proffered evidence must be reasonable. *See Eastman Kodak Co.*, 504 U.S. 1232, at ----, 112 S. Ct. at 2083. Therefore, contrary to the district court's reasoning in our case, the defendants were not entitled to summary judgment simply because they demonstrated a plausible rationale for their behavior. Rather, the focus must remain on the evidence proffered by the plaintiff and whether that evidence "tends to exclude the possibility that [the defendants] were acting independently." *Monsanto*, 465 U.S. at 764, 104 S. Ct. at 1471.

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1231-32 (3d Cir.), *cert. denied*, 510 U.S. 994, 114 S. Ct. 554, 126 L. Ed. 2d 455 (1993). *See also Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1365 (3d Cir. 1992) ("[I]n defending against summary judgment, [a plaintiff] need not 'eliminate all possible "independent" justifications by the manufacturer, [so that] only evidence of concerted action would be left in the record.' [It] need, rather, to produce 'evidence that tends to exclude the possibility of independent action.' *Monsanto*, 465 U.S. at 768, 104 S. Ct. at 1473."), *cert. denied*, 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

### i. The plaintiff offered to follow more restrictive price restraints

The defendant initially agues that the plaintiff, in a memorandum that Brasher authored to summarize an August 28, 1996, meeting with Trotter officials, offered to limit its discounts in the future to 10% of the suggested list price. (Ex. 9 at ¶ 2). It further asserts that,

> "The inescapable conclusion is that Trotter did *not* terminate Plaintiff for fear that Plaintiff would not 'play ball' on pricing issues. Indeed, Plaintiff's purported refusal to follow the DPSP's 20% discount provision *could not possibly* have been the basis for the termination. After all, Plaintiff agreed (or at the very least, proposed) to give only a 10% discount. And it agreed (or proposed) not to undercut the prices charged by other Trotter dealers."

(Doc. 103 at 28-29) (italics in original). The plaintiff retorts that this memorandum supports its

41

contention that Trotter was seeking a "price fixing agreement." (Doc. 113 at 40 n.10).

Alternatively, it asserts, "To the extent the memorandum is ambiguous, it is for the jury to decide

between the different interpretations of the evidence." (*Id.* (citation omitted)).

The court does not find the plaintiff's offer or agreement to limit its discounts to 10% to

be dispositive of the defendant's motion. In fact, it could be argued that the plaintiff capitulated

at this juncture to the reduced discount due to pressure from Trotter. This contention is therefore

not sufficient to support the granting of the motion for summary judgment.

### ii. Other dealers selling below allowable discounts were not terminated

The defendant next asserts that the plaintiff cannot disregard the evidence that other

dealers were ignoring the pricing guidelines. (Doc. 103 at 31-32). Trotter further asserts that

FitnessZone's witnesses confirm this. Trotter states, "Brasher complained . . . on several

occasions that other Trotter dealers were underpricing FitnessZone and costing FitnessZone

business." (*Id.* at 32). Trotter concludes that the refusal "of numerous dealers to follow Trotter's

suggested prices shows that there was no price-fixing conspiracy" and that FitnessZone "was not

terminated pursuant to such a conspiracy." (*Id.*).

The court cannot on a motion for summary judgment afford the defendant the liberal

reading of this evidence it proposes. The lone fact that other dealers were ignoring the pricing

guidelines does not sufficiently refute the plaintiff's allegations that Trotter was taking concerted

action against FitnessZone because of its discounts. It appears from the record that FitnessZone

may have disregarded the DPSP more blatantly than any other single dealer, arguably making it

the focus of Trotter's attention at that juncture.

### iii.  Other reasons for the termination

The defendant further asserts that it had four additional reasons for terminating

FitnessZone.[37]  (Doc. 103 at 32).  It claims that these reasons are premised upon FitnessZone's

conduct and not any conspiracy.  It further asserts that these reasons are "independent business

reasons to terminate" the plaintiff.  (Doc. 114 at 15 (citing *Dunnivant v. Bi-State Auto Parts*, 851

F.2d 1575, 1581 (11th Cir. 1988)) (The nonmovant "must produce evidence which establishes a

genuine issue as to whether there was 'a conscious commitment to a common scheme designed

to achieve an unlawful objective.' *Monsanto*, 465 U.S. at 764. . . .")).  The plaintiff responds that

the "problem with Trotter's proffered excuses is that they cannot be divorced from FitnessZone's

noncompliance with the pricing agreement as the reason for the termination."  (Doc. 113 at 34).

### 1.  Selling on the Internet

The first reason is that FitnessZone was selling over the Internet.  (Doc. 102 at 33-34).  In

support of this assertion, Trotter asserts that True and Body Solid, and other exercise equipment

manufacturers, also terminated FitnessZone due to Internet sales.[38]  Additionally, the defendant

points out that even Brasher testified that he was concerned that other Trotter dealers would

complain about FitnessZone's Internet sales.  (Brasher (1998) at 234).

It is undisputed that other dealers were complaining about FitnessZone selling over the

Internet.  However, that fact is simply not sufficient to warrant the granting of the defendant's

motion for summary judgment when this is so closely tied to the pricing issues in this case.

---

[37] In *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 664 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S. Ct. 488, 98 L. Ed. 2d 486 (1987), the court stated that "it is up to the nonmovant . . . to present evidence 'that tends to exclude the possibility' that defendant . . . acted independently. *Monsanto*, 465 U.S. at 764, 104 S. Ct. at 1471."

[38] According to the defendant, Hoist Fitness, a weight training equipment manufacturer, also told FitnessZone that it could not sell its products over the Internet. (Doc. 103 at 34 n.10 (citing Brasher (1998) at 180-81)).

## 2. "Drop-shipping"

The defendant next asserts that FitnessZone's "drop-shipping" of products that were sold over the Internet "was out of hand" and this was a primary reason for the termination. (Doc. 103 at 36 (citing Haberstroh at 165; Murray (1998) at 585, 593-95)). Trotter asserts that the termination was necessary because on June 1, 1994, Trotter instituted its $750 TSF charge for sales made outside of a dealer's territory and two years later, when the DPSP was initiated, "drop-shipping" was still an issue. (Doc. 103 at 37). In support of this assertion, Trotter states that prior to the termination, it levied fifteen TSF charges against FitnessZone or its predecessor.[39] (Ex. 4).

The court does not find this evidence compelling enough to warrant the granting of the defendant's motion. To the contrary, the evidence regarding the assessment and collection of TSFs tends to show that the defendant was using the TSFs inconsistently. By way of a simple example, Casanova testified that he was charged TSFs but was not required to pay the same. He specifically stated that he was told to "forget about the fee." (Casanova at 62, 90).

## 3. Other dealers' territories

Trotter next asserts that FitnessZone was terminated because of its refusal to abide by Trotter's territorial restrictions on sales. (Doc. 103 at 37). It further asserts that such limitations are legitimate and are common in the industry. (*Id.*). Thus, it concludes that any argument FitnessZone might assert that Trotter's territorial restrictions were pretextual is without merit. It

---

[39] As best this court can discern, only one TSF was charged prior to the DPSP. It was assessed on May 11, 1995. (Ex. 4 at 1). The remaining TSFs were assessed in 1997. (*Id.* at 2-5). One notice is undated. (*Id.* at 3).

In its memorandum, Trotter states, "And most telling of all, while there are no records reflecting the prices Plaintiff charged on eight of its fifteen TSF sales, the records relating to the remaining seven sales show that all seven involved discounts [at or] below 20%." (Doc. 103 at 37 and n.11). The defendant offers no cite reference for this conclusion; however, the plaintiff does not dispute the same.

further asserts that the record amply demonstrates the legitimacy of these concerns.  By way of example, Trotter states that it imposed the TSFs, FitnessZone complained to Trotter about 'N Shape's selling in its territory, and Snowhite complained about FitnessZone's extra-territorial sales.  (*Id*. at 38-39).

With regard to the TSFs, the plaintiff, as already noted, has demonstrated sufficient evidence to bring into question the application and collection of the TSFs.  With regard to FitnessZone's complaint about 'N Shape selling in its territory, the defendant asserts that "it admonished N'Shape [sic] to stop selling in Plaintiff's territory.  *See generally* Exh. 5."  (Doc. 103 at 38).  The court has examined exhibit 5 and it does not include an admonition to 'N Shape. Regardless, this is insufficient to support the granting of the motion for summary judgment. With regard to Snowhite's complaints, the court does not find them sufficient in view of the fact that the evidence demonstrates that other dealers were also selling outside their territory.

### 4. Personal animus

The last purportedly legitimate reason that Trotter proffers for terminating the plaintiff was the fact that Haberstroh had a vendetta against Brasher and/or FitnessZone.  (Doc. 103 at 39-41).  The court does not find that this is a sufficient "independent business reason" for the termination of the plaintiff under the circumstances.  *Dunnivant*, 851 F.2d at 1580.  Although this may be a sufficient reason in some other context, the evidence herein does not support the granting of the motion on this basis.

### c. Injury

Finally, on the § 1 claim, the defendant asserts that the plaintiff cannot show "injury" as a consequence of the termination.  (Doc. 103 at 41).  It claims that FitnessZone lost money in

1996, before being terminated. It then lost money in 1997, 1998, 1999, and 2000 in excess of the

of "the lost profits proffered by Plaintiff's expert" as a consequence of the termination. (*Id.*).

Thus, it concludes that "the termination could not possibly have injured Plaintiff. It would have

lost money regardless." (*Id.* at 41-42). The defendant further challenges the manner in which

the plaintiff's expert calculated the losses. (*Id.* at 42). The plaintiff responds that the defendant's

contention that it must establish that it would have made money but for the defendant's action is

incorrect. (Doc. 113 at 41).

In *Alan's of Atlanta, Inc.*, 903 F.2d at 1426, the Eleventh Circuit Court of Appeals stated

as follows:

> Antitrust injury, which in this Circuit has been coined "the fact of
> damage," *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978), or
> "cognizable injury," *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16,
> 20 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S. Ct. 246, 42 L. Ed. 2d 260 (1974),
> needs for its establishment a showing that the plaintiff is injured in some
> measurable amount, the injury caused by an improper effect "flowing" from the
> defendant's antitrust violation. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451
> U.S. 557, 562, 101 S. Ct. 1923, 1927, 68 L. Ed. 2d 442 (1981); *Hasbrouck v.
> Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir. 1988), *cert. granted*, 490 U.S. 1105,
> 109 S. Ct. 3154, 104 L. Ed. 2d 1018 (1989). As can be seen, the fact of damage
> and its cause are intertwined in the antitrust injury concept. The fact of damage is
> made out upon proof that the plaintiff's level of profits or sales or its present value
> is or was less than it otherwise would have been absent some intervening cause.
> *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123-24, 89
> S. Ct. 1562, 1576-77, 23 L. Ed. 2d 129 (1969); *Chrysler Credit Corp. v. J. Truett
> Payne Co.*, 670 F.2d 575, 580; *Hasbrouck, supra*, at 1042.

The plaintiff's expert, J. Timothy Downard, C.P.A., states in his report that the plaintiff

"suffered gross damages in the amount of $1,880,069 . . . resulting from lost net profits due to

the termination of [FitnessZone's] distributorship of Trotter products." (Doc. 113, Ex. B at 1).

The court finds this sufficient for purposes of the present motion. To the extent that the

defendant challenges the particulars of the calculation, those are matters more appropriately left

for the jury's consideration.

The defendant cites *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1453-54 (11th Cir. 1991), in which the court rejected profit calculations that contemplated a continuation of the defendant's allegedly-illegal conspiracy. *Todorov* is inapposite to the present matter in that the court rejected the calculation therein because it concluded that "[t]he antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person." *Todorov*, 921 F.2d at 1454. Unlike the plaintiff in *Todorov*, FitnessZone alleges its losses were sustained by its termination for refusing to participate in a purported vertical minimum price fixing agreement. Such damages are recoverable in this context. *See Pace Electronics, Inc. v. Canon Computer Systems, Inc.*, 213 F.3d 118 (3d Cir. 2000) (a dealer terminated for its refusal to abide by a vertical minimum price fixing agreement suffers antitrust injury and may recover losses flowing from that termination).

### B. Robinson-Patman Claim

FitnessZone asserts a second antitrust claim. It alleges that Trotter illegally set prices for its equipment through the use of the $750 TSF, in violation of the Robinson-Patman Act. *See* 15 U.S.C. § 13(a). Trotter filed a motion to dismiss for failure to state a claim upon which relief can be granted. (Doc. 8, p. 6). In support of its motion, Trotter asserted (1) that the TSF was a resale charge not covered by section 13(a); (2) that the complained-of lower price was equally available to FitnessZone; and, (3) FitnessZone has suffered no competitive injury. The parties briefed the issues and the undersigned entered a report and recommendation, finding that the motion was due to be denied. (Doc. 26 at 17). The parties objected to the court's findings and a district judge was assigned the case for purposes of reviewing the report and recommendation. (Doc. 27 &

47

29). That judge "determined that, in the interest of judicial economy, it would be best for the issue[s] to be in the posture of a motion for summary judgment." (Doc. 30). Accordingly, the court converted the motion to one for summary judgment and permitted the parties to conduct discovery and submit additional briefs. (*Id.*).

The parties again submitted briefs on the pertinent issues. Trotter incorporated its previous arguments from its initial brief, its reply brief, and its objections to the report and recommendation in support of the present motion for summary judgment. (Doc. 34 at 1). FitnessZone likewise adopted its previous positions and "emphasize[d] several points." (Doc. 35 at 5). Specifically, FitnessZone "emphasize[d]" that the evidence shows (1) that "'market area' or 'territory' was never defined, or never defined clearly, by Trotter;" (2) imposition of the fee was within Trotter's discretion; (3) the transshipment policy itself was vague and ill-defined; and, (4) the fee was not uniformly applied to all dealers. (*Id.* at 5).

## 1. The TSF Was a Resale Charge Not Covered by § 13(a)

Trotter asserts that the TSFs levied in this case against the plaintiff were in connection with FitnessZone's resale of Trotter products and not in connection with the initial sale of the product. (Trotter's Initial Brief (doc. 26) at 5-8; Trotter's Summary Judgment Brief (doc. 34 at 2)). Therefore, according to the defendant, these fees are not covered by Section 13(a). FitnessZone counters that the fees were a part of the purchase price. (FitnessZone's Initial Brief (doc. 10) at 4-6).

"Section 13(a) makes it unlawful 'to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce.'"

*Cemar, Inc. v. Nissan Motor Corp.*, 678 F. Supp. 1091, 1100 (D. Del. 1988).[40]  Price

discrimination is "defined as charging different prices to different purchasers. *FTC v.*

*Anheuser-Busch, Inc.*, 363 U.S. 536, 80 S. Ct. 1267, 4 L. Ed. 2d 1385 (1960).  However, many

courts have concluded that in this context, "price" means the net price actually received by the

seller for the goods, including all discounts and allowances. *Conoco, Inc. v. Inman Oil Co., Inc.*,

774 F.2d 895, 902 (10ᵗʰ Cir. 1985)." *Cemar*, 678 F. Supp. at 1101.  *See also Bell v. Fur Breeders*

*Agr. Co-op.*, 3 F. Supp. 2d 1241, 1242 (D. Utah 1998) ("Price is to be determined by reference to

the invoice submitted to the buyer, and 'any discounts, offsets, or allowances not reflected in the

invoice price.'"), citing *Black Gold, Ltd. v. Rockwood Industries, Inc.*, 729 F.2d 676, 682 (10ᵗʰ

Cir.), *cert. denied*, 469 U.S. 854, 105 S. Ct. 178, 83 L. Ed. 2d 113 (1984).  In *Black Gold, Ltd.*,

the court stated:

---

[40]  15 U.S.C. § 13(a) provides:

    (a) Price; selection of customers

    It shall be unlawful for any person engaged in commerce, in the course of such commerce, either
directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and
quality, where either or any of the purchases involved in such discrimination are in commerce, where such
commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the
District of Columbia or any insular possession or other place under the jurisdiction of the United States, and
where the effect of such discrimination may be substantially to lessen competition or tend to create a
monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either
grants or knowingly receives the benefit of such discrimination, or with customers of either of them:
*Provided*, That nothing herein contained shall prevent differentials which make only due allowance for
differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in
which such commodities are to such purchasers sold or delivered:  *Provided, however*, That the Federal
Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity
limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities,
where it finds that available purchasers in greater quantities are so few as to render differentials on account
thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall
then not be construed to permit differentials based on differences in quantities greater than those so fixed and
established: And *provided further*, That nothing herein contained shall prevent persons engaged in selling
goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and
not in restraint of trade:  And *provided further*, That nothing herein contained shall prevent price changes
from time to time where in response to changing conditions affecting the market for or the marketability of
the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods,
obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of
business in the goods concerned.

15 U.S.C. § 13(a) (emphasis in original).

Section 2(a)[41] is directed to price discrimination and nothing more.  Price is to be determined by reference to the invoice submitted to the buyer, and "any discounts, offsets, or allowances not reflected in the invoice price."  4 J. von Kalinowski, supra § 27.03[2].  Some delivery practices may constitute a violation of section 2(a) because they directly or indirectly affect the price paid for the goods.  *See, e.g., Corn Products Refining Co. v. FTC*, 324 U.S. 726, 740, 65 S. Ct. 961, 968, 89 L. Ed. 1320 (1945); 4 J. von Kalinowski, supra § 27.03[3], § 27.03[4] n.45 and text accompanying.  However, a violation of section 2(a) only arises when "discriminations in the terms of sale [operate] to permit the favored customers to purchase at a lower price than other customers, so that their only practical effect [is] to establish discriminations in price, precisely the evil at which the statute was aimed."  *Corn Products*, 324 U.S. at 740, 65 S. Ct. at 968.  "[T]he act is inapplicable to 'terms of sale except as they amount in effect to the indirect discriminations in price within the meaning of the remainder of subsection (a).'"  *Id.* (quoting H.R. Rep. No. 2951, 74th Cong., 2d Sess. 5) (emphasis added).

729 F.2d at 682.

To establish a violation of this section, the plaintiff must show (1) the sales of the fitness equipment were made in interstate commerce; (2) the equipment sold to the plaintiff was of the same grade and quality as that sold to the favored buyers; (3) Trotter discriminated in price between the plaintiff and the other buyers; and, (4) the discrimination had a prohibited effect on competition.  *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 556, 110 S. Ct. 2535, 110 L. Ed. 2d 492 (1990).  Additionally, to recover damages, the plaintiff must show the extent of its actual injuries.  *Id.*  The complaint and record evidence show that the plaintiff can satisfy the first and second elements.  The defendant contests the plaintiff's ability to demonstrate the third and fourth elements.

The defendant initially argues that the plaintiff has failed to establish the third element set forth above – whether there is price discrimination.  There is no dispositive precedent on this issue.  The defendant cites five cases in support of the argument that the fees assessed on the sale

---

[41] Section 2(a) of the Act is codified at 15 U.S.C. § 13(a).

of the Trotter equipment in this case are not covered by § 13(a). These cases include: *Cemar,*
678 F. Supp. 1091; *Kirby v. P.R. Mallory Co., Inc.*, 489 F.2d 904, 910 (7th Cir. 1973), *cert.*
*denied*, 417 U.S. 911 (1974); *Sofa Gallery, Inc. v. Mohasco Upholstered Furniture Corp.*, 639 F.
Supp. 677 (D. Minn. 1986); *Rickles, Inc. v. Frances Denney Corp.,* 508 F. Supp. 4 (D. Mass.
1980); and *Foremost v. Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), *cert.*
*denied*, 465 U.S. 1038 (1984), *overruled on unrelated grounds sub silentio by Hasbrouck v.*
*Texaco, Inc.*, 842 F.2d 1034, 1041 (9th Cir. 1987), *aff'd.*, 496 U.S. 543 (1990). The plaintiff
asserts that these cases do not support Trotter's argument.

The court agrees with the defendant that these cases hold or state that § 2(a) is
inapplicable to resale pricing differences. *See Cemar,* 678 F. Supp. at 1102-03 (the plaintiff's
failure to allege any connection between the delivery practices and a difference in price would
also warrant dismissal); *Foremost*, 703 F.2d at 546 (unlawful practices related to the original sale
of commodities are cognizable under § 13(a) and practices related to resale are cognizable under
§ 13(e)[42]); *Kirby*, 489 F.2d at 910-11 ("In the present case, it is apparent that the payments and
services to Hook are provided not in connection with the original sale from Mallory to Hook but
rather with respect to projected resales. The alleged violations in ths case are properly and

---

[42] 15 U.S.C. § 13(e), § 2(e) of the Act, provides:

(e) Furnishing services or facilities for processing, handling, etc.

It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or
purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or
furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing,
handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers
on proportionally equal terms.

15 U.S.C. § 13(e).

exclusively subsumed under §§ 2(d)[43] and 2(e), rather than § 2(a).”); *Rickles*, 508 F. Supp. at 5 ("Sections 2(d) and 2(e) of the Act prohibit a seller from discrimination in payments for services and facilities to purchasers who are buying commodities for resale.  15 U.S.C. [§§] 13(d), (e).  Section 2(a) of the Act, on the other hand, addresses discrimination with respect to the original sale to the purchaser.  ‘A seller’s payments as well as services in connection with the original sale to the purchaser rather than with regard to the purchaser’s subsequent resale were not cognizable under §§ 2(d) or 2(e) but were challengeable only under § 2(a) as indirect price discrimination.’  *Kirby v. P. R. Mallory & Co., Inc.*, 489 F.2d 904, 909 (7th Cir. 1973) (emphasis in original).”); *Sofa Gallery*, 639 F. Supp. at 678 ("it is clear that the payments alleged were not provided in connection with the original sales from [defendant] Mohasco to [competitor] Dayton’s, but rather [were provided in connection] with the projected resales of the furniture.  Thus, the alleged discriminations induced by Dayton’s are properly brought exclusively under Section 2(d) or 2(e), rather than 2(f).”[44]).

The plaintiff has been afforded a full opportunity to show that the price difference caused by the TSF fits within the parameters of § 13(a).  This it has failed to do.  It has not demonstrated that the TSF was price discrimination in connection with the sale of the equipment from Trotter

---

[43] 15 U.S.C. § 13(d), § 2(d) of the Act, provides:

(d) Payment for services or facilities for processing or sale

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 15(d).

[44] “Section 2(f), 15 U.S.C. § 13(f), prohibits the knowing inducement or receipt of a price discrimination that is unlawful under Section 2(a), 15 U.S.C. § 13(a).” *Sofa World*, 639 F. Supp. at 678 (footnote omitted).

to FitnessZone. To the contrary, the record demonstrates that it was a fee or cost that was imposed as a result of the resale of the equipment outside the plaintiff's normal service area. The fee could have been avoided by FitnessZone, or any other dealer for that matter, by selling within its service area. Accordingly, the motion for summary judgment on the § 13(a) claim is due to be granted.[45]

### 2. The "Lower Price" Was Equally Available to the Plaintiff

Trotter also asserts that the Robinson-Patman claim is due to be dismissed because the "lower price" was equally available to FitnessZone and its competitors. (Def. Brief at p. 8). Trotter's position is commonly known as the "availability defense." According to this defense, price discrimination does not occur when a seller offers more than one price for the same commodity to different buyers and the reduced price is functionally available on an equal basis to all buyers. *See DeLong Equip. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1516-17 (11th Cir. 1989), *cert. denied*, 494 U.S. 1081, 110 S. Ct. 1813, 108 L. Ed. 2d 943 (1990).

The district court in *DeLong* entered summary judgment for the defendant based on the judicially created "availability defense." The Eleventh Circuit reversed the lower court and remanded the case for trial because the "district court misapplied the availability defense to the unique facts. . . ." *Id.* at 1517. The Eleventh Circuit noted that it "assume[d] but expressly [did] not decide whether this circuit recognizes the availability defense." *Id.* at 1516 n.25.

This defense has been recognized by other courts. *See Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 751 (1st Cir. 1994); *Bouldis v. U. S. Suzuki*

---

[45] As already stated, FitnessZone emphasizes that the record demonstrates that "'market area' or 'territory'" was not clearly defined, the imposition of TSFs was within Trotter's discretion, the TSF policy was "vague and ill-defined," and the fee was not uniformly applied. However, accepting these points as being supported by the record, the court does not find that they alter the determination that the fee was in conjunction with the resale of the product and not the sales price paid by FitnessZone.

*Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir. 1983); *Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F. Supp. 1555, 1568 (N.D. Ga. 1992); *Mays v. Massey-Ferguson, Inc.*, 1990 WL 80673, *2 (S.D. Ga. April 26, 1990). *See also Shreve Equip., Inc. v. Clay Equip. Corp.*, 650 F.2d 101, 105 (6th Cir.), *cert. denied*, 454 U.S. 897, 102 S. Ct. 397, 70 L. Ed. 2d 213 (1981) ("Where a purchaser does not take advantage of a lower price or a discount which is functionally available on an equal basis, it has been held that either no price discrimination has occurred, or the discrimination is not the proximate cause of the injury."); *FLM Collision Parts, Inc. v. Ford Motor Company*, 543 F.2d 1019, 1025 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S. Ct. 1116, 51 L. Ed. 2d 545 (1977) (A difference in price does not fall under section 13(a) if all purchasers are given an equal opportunity to purchase the goods at the less expensive price.).

In *Caribe BMW, Inc.*, the court stated that "if a seller makes its favorable prices and terms available to an otherwise disfavored customer, that customer has no legal right to complain." *Caribe BMW, Inc.*, 19 F.3d at 751. Whether the better price in this case (no TSF) is available to the plaintiff is disputed. The defendant says it was and the plaintiff says it was not. The evidence adduced during discovery demonstrates that the "availability" of the better price is a disputed material fact.

Trotter asserts, "Plaintiff must introduce proof that the TSF was not applied to other dealers who sold outside of their sales area. This Plaintiff cannot do." (Doc. 34 at 3). Trotter then asserts that it "has introduced affirmative proof on this issue through the Affidavit of Roland Murray (Exhibit A). It demonstrates that the TSF was indeed uniformly applied. See, e.g., Exhibit A, p. 2 ("At all times . . . [since its inception], [t]his transshipping policy has always applied to *all* dealers") (emphasis in original). (Doc. 34 at 3).

54

Contrary to Murray's affidavit, the plaintiff notes that Casanova stated at his deposition that although he was charged TSFs, they were not collected and, as already noted, he was told by Trotter to forget about them.[46] Thus, whether the favorable price was available to other dealers and not FitnessZone who was billed and required to pay the TSFs is a matter in dispute. Therefore, summary judgment would be precluded but for the court's earlier determination that the TSF was not imposed in connection with the sales price so as to support a claim under § 13(a).

### 3. The Plaintiff Suffered No Competitive Injury

Trotter next alleges that FitnessZone has failed to demonstrate the last element under *Hasbrouck* – the prohibited effect on competition. Proof of actual competitive injury is not required. *J. Truett Payne Co. v. Chrysler Motors*, 451 U.S. 557, 562, 101 S. Ct. 1923, 68 L. Ed. 2d 442 (1981); *Falls City Industries v. Vanco Beverage*, 460 U.S. 428, 435, 103 S. Ct. 1282, 75 L. Ed. 2d 174 (1983). The plaintiff must allege and ultimately show that there is a "reasonable possibility that a price difference may harm competition." *Falls City,* 460 U.S. at 435. "[F]or purposes of § 2(a) [15 U.S.C. § 13(a)], injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Id.* An inference of injury to competition is permissible "[t]o the extent a disfavored purchaser must pay more for its goods than its competitors, [because] it is less able to compete. It has fewer funds available with which to advertise, make capital expenditures, and the like." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 564 n.4, 101 S. Ct. 1923, 1929 n.4, 68 L. Ed. 2d 442 (1981).

---

[46] Miller of the Gym Source also testified at his deposition that a dealer in Philadelphia, Pennsylvania, "continually" drop-shipped and was "never penalized." (Miller at 53).

The plaintiff herein alleges that it was assessed $11,250.00 in TSFs from May 1995 through July 1997 by Trotter, when Trotter terminated FitnessZone's distributorship rights.  It also alleges that the effect of this price discrimination has been a substantial and unreasonable decrease in competition of Trotter products throughout the United States and to injure, destroy, and prevent competition.  (Doc. 23 at 10).  It further states that as a result of Trotter's actions, FitnessZone was substantially damaged.  (*Id.*).

In support of its argument, Trotter cites *World of Sleep, Inc. v. La-Z-Boy*, 756 F.2d 1467, 1479-80 (10th Cir. 1985), *cert. denied*, 474 U.S. 823, 106 S. Ct. 77, 88 L. Ed. 2d 63 (1985) (Robinson-Patman claim failed where plaintiff could not demonstrate that seller's favoritism allowed competitors to lower their prices and thereby divert sales); *Lomar Wholesale Grocery v. Dieter's Gourmet Foods*, 824 F.2d 582, 597 (8th Cir. 1987), *cert. denied*, 484 U.S. 1010, 108 S. Ct. 707, 98 L. Ed. 2d 658 (1988) (Robinson-Patman price discrimination claim failed where plaintiff's sales increased by more than 20% during alleged price discrimination period and where plaintiff was the dominant firm in the market); *Black Gold, Ltd.*, 729 F.2d at 681 (where public service commission established a uniform resale price for all competitors, plaintiff could not demonstrate competitive injury, since favored the purchaser could not lower its prices and thereby divert sales); *First Comics, Inc. v. World Color Press*, 672 F. Supp. 1068, 1071-72 (N.D. Ill. 1987) (if price differences to competing sellers may not have been reflected in their retail prices, discrimination "may have no effect on competition whatsoever").

FitnessZone also alleges that it sustained actual losses as a consequence of the TSFs  that it was being charged until it was terminated by Trotter.  It further alleges competitive harm in that Trotter conspired with other dealers to limit competition by restricting prices, through the

56

use of TSFs and dealer market territories, particularly in Colorado and Texas.  (*See* doc. 23, ¶¶ 12, 13, 16, 17, 19).

It is undisputed that FitnessZone was charged $11,250.00 in TSFs prior to its termination by Trotter.  However, the court is not satisfied that this is sufficient under the evidence to support the competitive injury element of a § 13(a) claim for a number of reasons.  First, because the charge was a resale fee and not a part of the sale price, it is not price discrimination.  The plaintiff's decision to incur the fee was of its own making when it made the determination to sell the product outside its service area.  Second, the plaintiff's evidence demonstrates that competition was not being hampered through the use of the TSF; instead its sales were flourishing during the relevant period.  (*See* Doc. 113, Ex. B at Ex. 2-8).  Third, the plaintiff's expert attributes loss sustained by FitnessZone to the "termination," not the TSFs.  (Doc. 113, Ex. B at 1).  Summary judgment, therefore, would be due to be granted on the basis of this assertion as well.

## V.  PLAINTIFF'S STATE LAW CLAIMS

### A.  Breach of Contract Claim

According to the plaintiff, "FitnessZone and Trotter entered into an agreement in 1995, pursuant to which FitnessZone agreed to establish an Internet marketing program for Trotter products and use its best efforts to promote and sell Trotter products, and Trotter agreed to support the plaintiff's efforts and to supply products to the plaintiff for sale to the consuming public for such time as the plaintiff's sales of Trotter products met or exceeded minimum acceptable levels."  (Doc. 113 at 50-51; Doc. 23 (amended complaint) at ¶ 29).  The defendant asserts entitlement to summary judgment on the plaintiff's breach of contract claim on the basis

that there was no contract (doc. 103 at 45) and, even if there was, it is precluded under the statute of frauds (*id*. at 50).  The plaintiff retorts that there was a valid contract and the statute of frauds does not apply.  (Doc. 113 at 51-53).

"In the ordinary breach of contract action, the claimant must prove: (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Southern Medical Health Systems, Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995).  "A contract cannot be formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract." *Ex parte Cobb*, 781 So. 2d 208, 210 (Ala. 2000) (citing *Steiger v. Huntsville City Bd. of Educ.*, 653 So. 2d 975, 978 (Ala. 1995).  The defendant herein asserts that there is no testimony to support a finding that there was a contract.  (Doc. 103 at 45).  To the contrary, it asserts, the evidence shows that there was no mutual assent.

The evidence shows that in about August or September 1995, Brasher and Cooke met with Onigman and Murray in Atlanta at a trade show and discussed the plaintiff being the interactive Internet host for Trotter.  (Brasher (1998), Vol. 1 at 224-26).  At this juncture, the plaintiff had already started an Internet company (Hot New Products).  (*Id*. at 225).  Before this meeting, Trotter indicated to Brasher that it might be interested in doing its own Internet development.  (*Id*. at 226-27).  A week or two after the Atlanta meeting, Onigman informed Brasher that Trotter did not have the money at that time to do the Internet marketing.  (*Id*. at 229-30, 248-49; Cooke (2002) at 41).  Onigman then told Brasher that the plaintiff could put Trotter products on the "catalog."  (Brasher (1998), Vol. 1 at 229-30, 248-49).  Onigman told Cooke, "If you guys want to make the investment, then we will support you in selling products

over the Internet." (Cooke (2002) at 41).

In April 1996, Brasher sent Onigman a letter stating as follows:

In regards to our internet marketing discussions, I basically see it mirrowing [sic] the existing Pritikin Program. Hotnew [sic] Products will provide the interactive marketing efforts and generate the leads via the internet. I will personally work and process the leads in an effort to make the sale. Once the sale is made, I can submit the distributor cost plus $500.00 along with the customer information and shipping details. Once Trotter has received the funds from Hotnew [sic] Products, Trotter can contact the appropriate dealer and ship the equipment and or credit the dealers [sic] account if the dealer already has the equipment in stock. The dealer will receive the $500.00 for installing the equipment. With this arrangement all parties are served:

Trotter has a successful interactive marketing program for its products at no expense.

The customer is given an informed presentation on the benefits of Trotter products and upon a decision to purchase, get local installation and service.

The dealer is compensated for the installation and service, plus adds a new customer for future business.

Hotnew Products is compensated for interactive marketing efforts and expense.

We are almost finished with the Web site and it looks great.

(Ex. 7).

The Trotter information was placed on the website and there was a lot of activity. (Brasher (1998), Vol. 1 at 231). Because there were various issues, Brasher and Onigman agreed to begin work on "a solution" so that they could work things through the existing dealer program. (*Id.* at 231-32). For instance, it was determined that international deals were to be handled by Laura Turock at Trotter. (*Id.* at 232). Brasher also anticipated that there would be dealer complaints about the Internet. (*Id.* at 234).

On July 19, 1996, Brasher and Cooke met with Onigman, Aguilar, Murray, and Ronnie Montrond to discuss "a workable solution" for using the Internet. (Brasher (1998), Vol. 1 at 235,

237-38, 241). Brasher noted that the response they had received from its use was "unbelievable." (*Id*. at 238). Brasher states that, at this point, Trotter was unsure about how they were going to use the Internet as a marketing tool. (*Id*.). Trotter wanted to use the existing dealer network. (*Id*. at 239). They discussed FitnessZone getting the sale and shipping the treadmill to the dealer so that the dealer would not have to take one out of his inventory. (*Id*.). They also discussed how to go about "marketing, advertising, . . . [and the] search engines" to be used. (Murray (1998) at 531-33). No agreement was reached in Chicago other than that they would meet again in Birmingham as soon as possible. (Brasher (1998) at 241; Murray (1998) at 532-33).

On August 28, 1996, the parties met at a restaurant in Birmingham. (Brasher (1998) at 245-49; Murray (1998) at 543-51).[47] They again discussed proposals to incorporate Trotter's existing dealer network to alleviate dealer complaints about FitnessZone's Internet sales, the TSFs, and pricing. (Brasher (1998) at 246-47; Murray (1998) at 546, 555-56). Brasher states that they "agreed or came to a relatively [sic] conclusion that we would do a distribution through their existing dealer network, that when we got a sale, we would ship it to the dealer, he would install it. And I think at that point in time it was either five hundred dollar [sic] or something that we would give them." (Brasher (1998) at 246). They also discussed 75% of the profit going to the local dealer. (Brasher (2002) at 34). Murray told Brasher at that time that FitnessZone had been "too good a dealer too long" for them to be terminated over the Internet situation. (Brasher (1998), Vol. 2 at 138-45).

Following the August meeting, Cooke memorialized his understanding of the parties' discussions in a memorandum to Murray, Onigman, and Aguilar, outlining proposed terms of an

---

[47] It does not appear that Montrond was present for this meeting. Whether or not he was, is not of consequence to the present motions.

"interactive distribution agreement" between Trotter and FitnessZone. (Doc. 113, Ex. G; Cooke (2001) (Ex. I2) at 16). Brasher saw this as a "proposal."[48] (Brasher (1998) at 43; Brasher (2002) at 35). The memorandum states, among other things, that (1) FitnessZone would sell Trotter products at a maximum discount of 10%, other than to meet the price of another Trotter dealer and (2) FitnessZone would give 75% of the sales profit off of out of territory sales to the dealer in the territory where the product was sold. (Doc. 113, Ex. G). It also states that a "final signoff [sic] of an official agreement" would be necessary prior to the launch of any website. (Doc. 113, Ex. G or Ex. 9 at ¶ 15(a)). Trotter never accepted the terms of the agreement. (Murray (1998) at 558-60; Brasher (1998) (Vol. 1) at 251-53; Gene Brasher (2002) (Ex. B3) at 43-45). According to Brasher, he talked with Aguilar about getting together later to work out a couple of things. (Brasher (1998), Vol. 1 at 251).

On October 24, 1996, Aguilar wrote Brasher, detailing Trotter's position. He stated, among other matters, that "Trotters [sic] policy for the Internet will be consistent for all dealers," "Trotter will establish [its] own web site on the Internet," "Trotter will support The FitnessZone['s] promotion of Trotter products on their web site as long as the products are promoted at list price," FitnessZone will remit 75% of the profit on sales outside of Alabama to the local dealer; and, FitnessZone would keep all of the profit from sales in "dead zones". (Brasher at 248-50; Ex. 8). Brasher called Aguilar and asked if they were ready to start. (Brasher at 250). Aguilar told Brasher that he would get back in contact with him. (*Id.* at 250-51). Shortly after this, Onigman left Trotter. At this point, things were unresolved. (Brasher at 253-54). Trotter and Cybex were involved with merger discussions and this seemed to hold up

---

[48] Cooke testified that they had "come up with an agreement" at the October meeting. (Cooke (1998) at 478).

any further discussions with FitnessZone. (Brasher at 351-52). Murray stated that Trotter decided that they would not finalize a workable solution to the outstanding issues due to the complexity and nature of the proposals. (Murray (1998) at 558).

The April 1997 Hot New Products Stock Purchase Agreement by Vincent Bruno included a section on "Binding Contracts and Agreements," which purported to list all of Hot New Products contracts and agreements with third parties "material to the financial conditions or operations of the Corporation." (Ex. G at § 5.11). Although the attached schedule lists FitnessZone's March 1997 letter agreement with True Fitness, it does not list any contract with Trotter. (*Id.* at Schedule 5.11 ("Contracts and Agreements"), ¶ 8).

As noted previously herein, Trotter continued to fill orders from FitnessZone until Trotter terminated FitnessZone's dealership on July 1, 1997. From January through June 1997, FitnessZone's purchases of Trotter equipment increased by approximately ninety-six percent from the same period in 1996. (Doc. 113, Ex. B, Ex. 6).

In *Lenihan v. Boeing Co.*, 994 F. Supp. 776, 801-02 (S.D. Tx. 1998), the court succinctly stated the applicable law:

> "Under Alabama law, to render the contract valid, the agreement of the parties as expressed in the offer and acceptance must be certain and explicit and their full intention ascertainable to a reasonable degree of certainty." *Erika, Inc. v. Blue Cross & Blue Shield*, 496 F. Supp. 786, 787-88 (S.D. Ala. 1980). Their agreement must be neither vague nor indefinite. *See Dillon v. AFBIC Dev. Corp.*, 420 F. Supp. 572, 576 (S.D. Ala. 1976), *aff'd in part and rev'd in part on other grounds*, 597 F.2d 556 (5th Cir. 1979). A contract will not be enforced where it is so "vague and indefinite in terms that the intention of the parties cannot be fairly and reasonably collected from them." *Alabama Nat'l Life Ins. Co. v. National Union Life Ins. Co.*, 275 Ala. 28, 151 So. 2d 762, 766 (1963); *see also Mobil Oil Corp. v. Schlumberger*, 598 So. 2d 1341, 1345 (Ala. 1992); *Muscle Shoals Aviation, Inc. v. Muscle Shoals Airport Auth.*, 508 So. 2d 225, 228 (Ala. 1987); *Alexander v. Petroleum Installation Co., Inc.*, 695 So. 2d 30, 31 (Ala. Civ. App. 1996). "'[A]n agreement to be binding must be definite and certain,' and 'must be

sufficiently definite to enable the court to determine its exact meaning and fix definitely the legal liability of the parties.'" *Poultry Haulers, Inc. v. Pillsbury Co.*, 247 F. Supp. 556, 557 (N.D. Ala. 1964) (quoting *Alabama Nat'l Life Ins. Co.*, 151 So. 2d at 766), *aff'd*, 353 F.2d 538 (5th Cir. 1965). "[A] trial court should not attempt to enforce a contract whose terms are so indefinite, uncertain, and incomplete that the reasonable intentions of the contracting parties cannot be fairly and reasonably distilled from them." *Cook v. Brown*, 393 So. 2d 1016, 1018 (Ala. Civ. App. 1981); *see also Smith v. Chickamauga Cedar Co.*, 263 Ala. 245, 82 So. 2d 200, 203 (1955); *Mozley v. Boen*, 41 Ala. App. 596, 143 So. 2d 304, 304 (1962).

Construing the evidence in a light most favorable to the plaintiff, the evidence is sufficient to show that the plaintiff did act as an interactive marketing distributor for the defendant; it paid for the items while the relationship existed; and, to a limited extent, the defendants supported its Internet marketing activities of their products through the plaintiff's website. (See Cooke (1998), Vol. 1 at 199-200). Although the evidence supports the conclusion that there was an agreement that Trotter would "support" the plaintiff's Internet marketing activities at least for an unspecified period, everything beyond that is conjecture and speculation. What is lacking is what the agreed upon terms were.[49] This is most effectively demonstrated by what occurred over the next year to eighteen months following the initial meeting. The testimony of Cooke, Brasher, and Murray demonstrates that the parties were continuing to discuss and negotiate various terms for Internet marketing and distribution of Trotter products.

---

[49] In *Ex parte Conaway*, 767 So. 2d 1117, 1119 (Ala. 2000), the Alabama Supreme Court stated,

. . . . "An ambiguity in a contract does not automatically make the contract void. Once the trial court determines that a contract is ambiguous, it is for the jury to determine the true meaning of the contract. *Decker v. Marshall-DeKalb Elec. Coop.*, 659 So. 2d 926 (Ala. 1995); *Rivers v. Oakwood College*, 442 So. 2d 74, 76 (Ala. 1983). This Court has stated: 'If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment. However, if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury.' *McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991)."

This court does not find the evidence sufficient to submit this claim to the jury because the deficiencies in this case go beyond ambiguity. To return a verdict under the circumstances would require speculation and conjecture.

They were discussing pricing, distribution, and profit sharing with dealers outside of the

plaintiff's usual area.  This is evidenced in Brasher's April 10, 1996 letter to Onigman wherein

he states, "In regard to our internet marketing discussions. . . ."  (Ex. 7).  Thereafter, he posits

ideas as to how any marketing and distribution strategy would work.  Additionally, the need for

the July and August 1996 meetings with principals from Trotter and FitnessZone to arrive at

"workable solutions" is also evidence of the absence of an enforceable agreement, not evidence

of any terms.  It is further evident that no such solution was arrived at following the meetings.

Although Cooke asserts that there was an "agreement" as a result of the meeting, his

memorandum thereof demonstrates to the contrary.  He specifically states therein that a "final

signoff [sic] of an official agreement" is necessary.  (Ex. 9).  Brasher correctly describes the

results of the meeting as a proposal.  The court does not find this evidence sufficient to support a

finding of a valid contract in this action.  Summary judgment is due to be granted on this claim.[50]

### B. Promissory Estoppel Claim

FitnessZone alleges that "[o]n at least two separate occasions, including July 19, 1996,

and August 28, 1996, Trotter promised the plaintiff that it would support the plaintiff's Internet

marketing efforts and continue to supply the plaintiff with Trotter equipment upon demand, and

that the plaintiff's operation of the Internet program would not jeopardize the plaintiff's status as

a Trotter dealer."  (Doc. 23 at ¶ 34).  FitnessZone further alleges that it relied on these promises

when investing in, developing, and maintaining an Internet marketing program for Trotter.  (Id. at

¶ 36).  Trotter asserts that this claim is due to be dismissed because (1) FitnessZone has not

adequately established that it relied on the representations, (2) it continued to supply FitnessZone

---

[50] Because the court finds that there is not an enforceable contract, the court does not find it necessary to address the defendant's statute of frauds argument.

64

for almost a year after the alleged promises, and (3) FitnessZone has not established that Trotter should have reasonably expected it to take action as a result of the promises. (Doc. 103 at 54-55).

In discussing promissory estoppel, Alabama courts have stated that "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Wyatt v. BellSouth, Inc.*, 18 F. Supp. 2d 1324, 1326 (M.D. Ala. 1998) (quoting *Davis v. University of Montevallo*, 638 So. 2d 754, 757 (Ala. 1994), and citing *Bush v. Bush*, 177 So. 2d 568, 578 (Ala. 1964)); *see also Mazer v. Jackson Insurance Agency*, 340 So. 2d 770, 772-73 (Ala. 1976). "The gravamen of the claim of promissory estoppel is detrimental reliance." *Wyatt*, 18 F. Supp. 2d at 1326.

The defendant initially asserts that the reliance aspect has not been adequately established for three reasons: (1) when Murray made the representation, Brasher did not believe him; (2) any reliance by Brasher would be unreasonable; and, (3) FitnessZone did not actually rely on the promises. (Doc. 103 at 54-55).

As to the first reason, that Brasher did not believe Murray, the plaintiff states that although Brasher did state in the morning session of his deposition that he did not believe Murray, he later corrected his testimony, stating that he may have misunderstood the question. During the morning testimony, Brasher was asked about the provision in the Dealer Performance agreement that stated that Trotter in its discretion could unilaterally terminate a dealer. (Brasher (1998) at 131). As the questioning progressed, he was asked if he discussed this provision with

anyone. Brasher stated he talked with Murray who told him not to worry about it because he had

"been too good of a dealer too long for us to terminate you." (*Id*. at 134). The following

occurred next:

> Q. Okay. Did you believe him at that time? Did you feel like he was being truthful with you?
>
> A. No.
>
> Q. Why did you feel that?
>
> A. I don't know. I think it was just a feeling that he wanted to pass the buck along to somebody else. I don't know. I'm not to make that determination how - - like I say, I couldn't read his mind.

(*Id*. at 135). After lunch, the following occurred:

> Q. We talked a good bit earlier before lunch about the seven hundred and fifty-dollar transshipping fees
>
> A. Uh-huh. I've been thinking about - - something come [sic] to mind about this seven hundred and fifty dollars and speaking with Roland. I want to clarify that when I talked with Roland and he made the comment that, don't worry about this. And I think you asked me - - you know, I don't know whether I understood you exactly. You asked did I believe him when he asked me - - if I believed Roland. I want to clarify that, yeah, I did believe Roland.

(*Id*. at 187-88). The defendant asserts that "after having lunch with his lawyer and being

informed that he had just blown his promissory fraud claim, Brasher decided to change his

testimony." (Doc. 114 at 28). Although one certainly might argue this testimony is odd, the

court cannot conclude that the plaintiff was participating in a fraud at this juncture so as to nullify

this testimony. There is no evidence cited by the defendant showing that the earlier testimony

was discussed at lunch and that there was any inappropriate suggestion that he modify, change, or

otherwise alter his previous response. At no point did defense counsel follow up on this response

to determine what precipitated the same. Under the circumstances, the court is unwilling to

attribute any nefarious or otherwise improper motivation to the change.

Concerning the defendant's assertion that any reliance by Brasher on Murray's statements would be unreasonable because the DPSP clearly contradicted the alleged verbal promise, Trotter cites *Pranzo v. Itec, Inc.*, 521 So. 2d 983, 985 (Ala. 1995), for the proposition that the trial court properly affirmed "summary judgment on [a] promissory estoppel claim where reliance on [an] oral statement was unreasonable because plaintiff, a terminated employee, was given [a] contract stating that he could be terminated at any time." (Doc. 103 at 54). The plaintiff retorts that the defendant cannot rely upon the agreement for this purpose because Trotter has disavowed the contractual nature of the agreement. (Doc. 113 at 55). In reply, Trotter states that *Pranzo* is cited not because it involved a contract, but because "a plaintiff cannot reasonably rely on oral statements when given written documents that contradict them."[51] (Doc. 114 at 29).

The court finds the defendant's arguments compelling except for the unusual circumstances surrounding the conversations dealing with the DPSP and the continuing issues concerning the Internet. The court cannot find as a matter of law at this juncture that the plaintiff's reliance was unreasonable because of the DPSP.

Concerning the last argument, that FitnessZone did not actually rely on the promises, the

---

[51] Trotter also cites to *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997), with regard to this claim for the proposition "that the 'justifiable reliance' standard adopted in *Hickox*, which eliminated the general duty on the part of a person to read *the documents received* in connection with a particular transaction (consumer or commercial), should be replaced with the 'reasonable reliance' standard . . .". (Italics supplied by the defendant). Trotter also cites to *Wilma Corp. v. Fleming Foods of Ala., Inc.*, 613 So. 2d 359, 364-65 (Ala. 1993), noting its holding that, "Plaintiff did not justifiably rely on defendant's statement that signing of lease agreement was a 'done deal' when plaintiff received *a letter* from the defendant stating that defendant's representative would have to obtain the approval of his supervisors to finalize the lease agreement." (Doc. 114 at 29).

Trotter further cites to "*Gray v. Liberty Nat'l Life Ins. Co.*, 623 So. 2d 1156, 1159 (Ala. 1993) (bank statements, not a contract, at issue; *Casassa v. Liberty Life Insurance Co.*, 949 F. Supp. 825, 831 (M.D. Ala. 1996) (Annual Report alerting plaintiff to inconsistency); *Kelly v. Connecticut Mutual Life Insurance Co.*, 628 So. 2d 454, 458 (Ala. 1993) (notice of premium)" with the notation that "[a]lthough these latter cases stand for the principle that the statute of limitations begins to run on a fraud claim when documents contradicting oral representations are received, the principle of *notice to the plaintiff* is the same for reasonable reliance. . . ." (Doc. 114 at 29-30 & n.10).

defendant asserts that the evidence shows that FitnessZone made "virtually all of the investments" prior to the representations in July and August 1996. (Doc. 103 at 55). The plaintiff counters that it relied on the promises in continuing to invest substantially in its Internet operations and in continuing to focus its effort on growing its Internet business. (*Id.*). The evidence before the court does demonstrate that at this juncture the investors were infusing cash and credit into FitnessZone, premised, at least in part, on the promise the Internet appeared to hold. Thus, the argument that FitnessZone did not actually rely on the promises is not persuasive on the motion for summary judgment.

The defendant next asserts that the promissory estoppel claim is due to be dismissed because Trotter did continue to supply FitnessZone with equipment for approximately one more year. (Doc. 103 at 55). It further states that the purported "promise" "does not include an infinite time frame." (*Id.*). FitnessZone does not specifically address this argument other than to state that "Trotter promised not to terminate FitnessZone because of FitnessZone's internet sales activity, and Trotter's termination of FitnessZone was contrary to its promise." (Doc. 113 at 55).

Neither party cites any case authority. The court has likewise found nothing dispositive on this issue. In essence, the plaintiff is asking this court to find that it was reasonable for it to keep operating in the manner it did premised on the representations of Murray. Under the circumstances, the court is disinclined to allow a promissory estoppel claim to be used to create liability against Trotter eleven months after the representations were made. It is argued that this simply is far too long, particularly in light of the problems, issues, and discussions that occurred during the intervening period to permit such a claim. Additionally, the defendant asserts that there was no understanding that FitnessZone would never be terminated. On the other hand,

because of the purported communications between the parties during this time and the

willingness to continue doing business, the reliance is arguably reasonable.  After much

consideration, the court concludes that summary judgment on this claim is not appropriate at this

juncture.

### C.  Promissory Fraud Claim

FitnessZone asserts that at the time Murray made the foregoing representations, Trotter

had no intent to perform.  (Doc. 23 at ¶ 40).  Trotter retorts that FitnessZone cannot prove that it

intended to deceive FitnessZone at the time of the representations.  (Doc. 103 at 56).  It further

asserts that the plaintiff cannot demonstrate that it relied upon Murray's representations for the

reasons stated in the previous section.  (*Id*. at 59 & 60).  FitnessZone obviously disagrees.

In *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 217-18 (Ala. 2001), the

Alabama Supreme Court stated:

> "In *Howard v. Wolff Broadcasting Corp.*, 611 So. 2d 307 (Ala. 1992),
> *cert. denied*, 507 U.S. 1031, 113 S. Ct. 1849, 123 L. Ed. 2d 473 (1993), this Court
> stated:
>
>> "To establish a cause of action for promissory fraud, the
>> plaintiff must prove: (1) that the defendant made a false
>> representation of a material fact; (2) that the false representation
>> was relied upon by the plaintiff; (3) that the plaintiff was damaged
>> as a proximate result of the reliance; (4) that the representation was
>> made with a present intent to deceive; and (5) that when the
>> representation was made the defendant intended not to perform in
>> accordance with it."
>
> *Id.* at 311.  *See also Pinyan v. Community Bank*, 644 So. 2d 919, 923 (Ala. 1994);
> *Capitol Constr. Co. v. Alabama Exterior Supply, Inc.*, 696 So. 2d 1087, 1090
> (Ala. Civ. App. 1997).  "The burden is on the plaintiff to prove that when the
> promise was made the defendant intended to deceive."  *Goodyear Tire & Rubber
> Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998) (emphasis added).

> In support of its first assertion, that the plaintiff cannot demonstrate the requisite intent to

deceive, Trotter cites to the following:

> Q. My last question on this issue, I think, is when your were given their alleged promise that you testified to, is your testimony that Roland [Murray] made that promise intending to deceive you?
>
> MR. GOODMAN: Objection to the form of the question. You can answer.
>
> A. Then, no.

(Doc. 103 at 56-57 (citing Brasher (2000) at 84-85)). FitnessZone asserts that Brasher's opinion is irrelevant to Trotter's actual intent. (Doc. 113 at 46 n.13). The court does not find Brasher's opinion dispositive of this issue.

FitnessZone further states, "Murray testified, however, that he believed dealers could be terminated for noncompliance with the DPSP. (Murray I at 372-75). If Murray believed such to be true at the time he made the statements to Gene Brasher, which he concedes that he did, he clearly possessed the requisite intent when assuring FitnessZone that it would not be terminated." (Doc. 113 at 46 (footnote omitted)). The defendant retorts that the "mere fact that dealers *could be* terminated for violations did not mean in any way that Murray intended to deceive FitnessZone or that Trotter was contemplating FitnessZone's termination in 1996." (Doc. 114 at 31) (italics in original).

The court agrees with the defendant's argument that the fact that dealers could be terminated for noncompliance with the DPSP does not adequately demonstrate that, at the time of the representations, it possessed the intent not to live up to the same. This is demonstrated by the efforts undertaken by the parties to reach a "workable solution" to the issues surrounding the use of the Internet.

Two other facts also indicate that Trotter had no intent to deceive at the time of the

70

purported agreement.  First, Trotter appears to have continued to impose the TSFs in an effort to

resolve the issues.  (Murray Dep. (1998) at 560).  Second, the parties continued doing business

for an additional eleven months between the discussions and the termination of FitnessZone as a

dealer.

To the extent that FitnessZone asserts that Trotter's intent to deceive it is demonstrated by

Haberstroh's statement to Casanova that "Trotter was trying to 'get around' or 'terminate' its

Internet 'deal' with FitnessZone," the court finds that this statement is insufficient to overcome

the motion for summary judgment on this claim.  The date of the statement is not specified in

Casanova's deposition.  Therefore, the probative value of the same is questionable.  It appears

that the statement would have to have been made in or after May 1997 because Haberstroh began

overseeing this region after the Cybex-Trotter merger at about that time.  (Haberstroh at 8).  This

is a full eight months after the statements by Murray upon which this claim is based.  The court

does not find this sufficient to allow an inference that Trotter intended to deceive FitnessZone at

the time of Murray's statements in July and August 1996.  Accordingly, the motion for summary

judgment is due to be granted on this claim.

The court further finds that FitnessZone's reliance on *Williams v. Williams*, 786 So. 2d

477 (Ala. 2000), is insufficient to alter the court's conclusion.  *Williams* is factually and legally

distinguishable from the present case.  In that case, the plaintiff, a basketball coach, brought an

action against the Alabama State University ("ASU") Athletic Director alleging that he

fraudulently induced the plaintiff to sign a contract with ASU to serve as its interim coach by

promising him employment for a subsequent year.  Following a jury verdict for the plaintiff, the

defendant appealed, alleging, among other things, that the plaintiff failed to "prove a present

intent to deceive." *Williams*, 786 So. 2d at 479.

The Alabama Supreme Court summarized the relevant evidence as follows:

> ASU President Harris testified that the athletic director "knew full well" that the position Coach Williams would be filling was only "a one-year job." Dr. Harris also testified that before the athletic director transmitted the offer to Coach Williams, he had been put on notice by Dr. Harris that the position would be an interim position for one year. The jury had before it evidence from which it could find that the athletic director, knowing his lack of authority and knowing Coach Williams's insistence upon a term of more than one year, made an offer that exceeded his authority. When told by Dr. Harris, one day after he had made the offer, that he should retract that portion of the offer dealing with employment in excess of a year, he did not do so. Viewing the evidence most favorably to Coach Williams, as we must, we conclude that it would support the jury's apparent finding of promissory fraud.

*Williams*, 786 So. 2d at 479-80. The evidence in *Williams* was much stronger and closer in time to the purported representations underlying the action than the testimony of Casanova regarding Haberstroh's comment to him in this case. Although the plaintiff argues that "[t]his evidence, if believed by the trier of fact, shows that Trotter affirmatively lied to FitnessZone" and that "the question of Trotter's intent is for the jury," the court finds that the evidence of Trotter's intent at the time of Murray's statements is insufficient to overcome the motion for summary judgment. (Doc. 113 at 46).[52]

## D. Fraudulent Suppression Claim

The plaintiff asserts a fraudulent suppression claim premised on the fact that Trotter "suppressed from the plaintiff the fact that the distributorship could be terminated for other reasons or no reason at all, which fact Trotter was under an obligation to disclose." (Doc. 23 at ¶ 45). FitnessZone further asserts, "[f]rom November 1995 to July 1, 1997, Trotter suppressed

---

[52] For the reasons stated in the last section, the court does not find the defendant's argument on the reliance and "reasonable reliance" issues persuasive.

from the plaintiff the fact that it considered the plaintiff's Internet marketing efforts to be a basis for termination of the plaintiff's distributorship." (*Id.* at ¶ 46). The defendant counters that the "claim fails primarily because the fact that any dealer could be terminated by Trotter for any reason or no reason *was disclosed* to FitnessZone in the DPSP, which Brasher received and read." (Doc. 103 at 61) (italics in original).

"The elements of a claim of fraudulent suppression are: (1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression." *Ex parte Liberty Nat. Life Ins. Co.*, 797 So. 2d 457, 465 (Ala. 2001) (citing *Ex parte Dial Kennels of Alabama, Inc.*, 771 So. 2d 419, 421 (Ala. 1999)).

The first issue presented by the parties is whether the defendant suppressed the fact that the plaintiff could be terminated "for other reasons or no reason at all" from the plaintiff. The defendant claims that that is not possible because the plaintiff received the DPSP that includes this information. The court agrees. The evidence shows that FitnessZone received the DPSP and that FitnessZone discussed with the defendant whether it would be terminated because of its Internet activities. Therefore, this alone would be insufficient to state a claim for fraudulent suppression.

FitnessZone further asserts in the amended complaint that Trotter suppressed from November 1995 to July 1, 1997, that it considered the plaintiff's Internet efforts to be a basis for termination. (Doc. 23 at ¶ 46). Under the circumstances, it was evident to FitnessZone that its Internet marketing was creating issues and problems for the defendant with respect to its dealer

network.  The protracted discussions concerning these issues demonstrate an awareness of the

significance of the same.  Brasher acknowledged in his deposition that he was aware of the

DPSP, which included a provision for unilateral termination of a dealer without notice.  (Brasher

(1998) at 130-31).  He claims, however, that he relied on Murray's representations that he did not

need to "worry about it."  (*Id.* at 133-35).  The defendant asserts that FitnessZone cannot rely on

these representations because FitnessZone was provided with the DPSP which was contrary to

Murray's statements.

The defendant cites three cases in support of its position: *Locklear Dodge City, Inc. v.

Kimbrell*, 703 So. 2d 303, 305 (Ala. 1997); *Roper v. Assoc. Financial Services of Ala., Inc.,* 533

So. 2d 206, 208 (Ala. 1998); and *Bailey v. Rowan*, 751 So. 2d 504 (Ala. 1999).  In *Locklear*, the

plaintiff brought a fraudulent suppression claim against the dealer from whom she purchased a

used automobile.  She asserted, among other things, that during a test drive, the salesman

represented that "to the best of his knowledge the car had not been wrecked."  The evidence

showed that the car previously had been involved in two accidents.  However, the plaintiff and

her husband signed various documents at the time of the sale, including one that "specifically

stated that the dealer had purchased the car at auction; therefore, it made no representation about

the car's prior use."  She also signed a disclosure document that provided that the vehicle might

"have undisclosed mechanical or body repairs or may have been involved in accidents."

Rejecting the plaintiff's claim, the court stated:

> This Court has previously held that an automobile buyer cannot recover
> for misrepresentation where the buyer has signed a disclosure statement revealing
> the possibility of the kind of damage the buyer alleges was suppressed.  *Young v.
> Serra Volkswagen, Inc.*, 579 So. 2d 1337 (Ala. 1991); *Couch v. Woody Anderson
> Ford, Inc.*, 558 So. 2d 888 (Ala. 1989); *Planchard v. Dobbs Mobile Bay, Inc.*, 529
> So. 2d 942 (Ala. 1988); *Page v. Dobbs Mobile Bay, Inc.*, 599 So. 2d 38 (Ala. Civ.

74

App. 1992). Moreover, in *Hines v. Riverside Chevrolet-Olds, Inc.*, *supra*, this Court stated:

> "This Court has held that the signing of a disclaimer or a statement disclosing the possibility of damage to a vehicle . . . precludes a new car purchaser from recovering on claims of deceit, misrepresentation, and suppression of a material fact, based on allegations of damage within the purview of the disclaimer or disclosure statement. *Planchard v. Dobbs Mobile Bay, Inc.*, 529 So. 2d 942 (Ala. 1988); *see also Young v. Serra Volkswagen, Inc.*, 579 So. 2d 1337 (Ala. 1991); *Couch v. Woody Anderson Ford, Inc.*, 558 So. 2d 888 (Ala. 1989); *Page v. Dobbs Mobile Bay, Inc.*, 599 So. 2d 38 (Ala. Civ. App. 1992). This rule is based on a purchaser's knowing and intelligent acknowledgment of the possibility of such damage or a knowing and intelligent waiver of legal rights, both of which must be evidenced by the signature of the new car purchaser beneath a disclaimer or disclosure statement on the contract of sale or 'buyers order.'"

655 So. 2d at 922 (emphasis in original). Even though *Hines* involved the purchase of a new automobile, the principle is applicable also to the purchase of a used one. One who signs a disclosure statement, as Mrs. Kimbrell did, acknowledges the possibility of such damage. By signing the disclosure statement, Mrs. Kimbrell knowingly and intelligently acknowledged that she had been informed of a possibility that the car she was purchasing had been repaired or had been involved in an accident. Therefore, we must conclude that, as a matter of law, Locklear did not suppress this information.

*Locklear Dodge*, 703 So. 2d at 305.

In *Roper*, the plaintiffs signed what they believed to be a ten year loan. When the defendant "called" the loan after three years, the plaintiffs brought an action alleging that the defendant had charged a usurious rate of interest on the loan in violation of state law and that it had fraudulently induced them to enter into the agreement. The trial court granted summary judgment on the misrepresentation claim. Affirming the grant of summary judgment, the Alabama Supreme Court stated:

> . . . the "Call Option Disclosure Statement," which both Ropers signed, unambiguously disclosed Associates' right to call the note due and payable before

the expiration of the note's 10-year term.  The record does not contain any
evidence indicating that the Ropers were incapable, mentally or physically, of
examining the loan document or inquiring as to the terms of the loan before
signing.  Under these circumstances, we hold that a reasonably prudent person
exercising ordinary care would have discovered the call provision and, therefore,
that the Ropers' reliance on Associates' alleged misrepresentation was not
reasonable.

Last, we find no merit in the Ropers' claim that Associates fraudulently
concealed the call provision in the 1983 loan.  A suppression of a material fact is
one of the requisite elements of a cause of action for fraudulent concealment.
Code 1975, § 6-5-102; *Wilson v. Brown*, 496 So. 2d 756 (Ala. 1986).  In view of
the fact that the Ropers signed the "Call Option Disclosure Statement," we
conclude that Associates did not suppress a material fact.

*Roper*, 533 So. 2d at 208-09.

In *Bailey*, the plaintiff signed an employment agreement which provided that he would

receive a bonus if he worked for "the full one (1) year term."  *Id.* at 506.  Thereafter, he was told

that he would "get a bonus regardless of whether he stayed for an additional year."  *Id.*  The

plaintiff terminated the relationship prior to the end of the year and was not paid the bonus.  He

brought a state court action, alleging two counts of breach of contract and three counts of fraud.

The trial entered judgment as a matter of law in favor of the employer on the breach of contract

claims and the jury returned a verdict for the plaintiff on the fraud claims.  The defendant

appealed the denial of its motion for a judgment notwithstanding the verdict.  The Alabama

Supreme Court held that the plaintiff could not have justifiably relied upon the employer's

subsequent oral statements in view of the fact that the prior documentation clearly contradicted

the statements.  *Id.* at 507-08.  It stated:

The undisputed evidence in this case is that Rowan was 31 years old when
he signed the employment contract.  He had the benefit of over 20 years of
education, including 4 years of medical school.  Rowan had also completed a
five-year residency program at the University of South Alabama.  The plain and
unambiguous language of the employment contract states that Rowan would

receive a bonus only if he renewed his employment with Bailey for a second year and was still "employed by [Bailey] at [Bailey's] corporate year end following the first anniversary of [the] agreement." The plain and unambiguous language of the employment contract also states that the contract could be modified only by a writing signed by both Bailey and Rowan. "Other than by closing his eyes to avoid discovering the truth, [Rowan] could not have failed to realize" that the contract terms regarding the bonus could not be modified without a signed writing. *Hurst*, 621 So. 2d at 969. Accordingly, Rowan did not justifiably rely on any representation he says Bailey made with respect to the bonus. [ ] *See id.*

*Bailey*, 751 So. 2d at 507-08 (footnote omitted).

The defendant herein asserts that "*Bailey* is especially on point" and "[t]he case at hand presents even more of a persuasive case against Plaintiff's claim, because unlike *Bailey*, the case at hand was filed after *Foremost Ins. Co. v. Parham*, 693 So. 2d 409 (Ala. 1997), and thus is governed by the more lenient 'reasonable reliance,' rather than 'justifiable reliance standard,' standard."[53] (Doc. 103 at 62). The court does not agree with the defendant. The facts in *Bailey* are more compelling in that the parties signed a contract that specifically limited the way it (the contract) could be modified. No such provision or language is contained in the DPSP.

Although the defendant is correct that "[u]nder Alabama law, written disclosures may defeat a claim of justifiable reliance (*Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524, 1531 (11ᵗʰ Cir. 1993) (citing *McConico v. Corley, Moncus, and Bynum, P.C.*, 567 So. 2d 863, 864 (Ala.

---

[53] "Reliance must be reasonable, *see Wheelan v. Sessions*, 50 F. Supp. 2d 1168, 1174 (M.D. Ala. 1999); *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997), [ ] and 'if the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.' *Torres v. State Farm Fire & Cas. Co.*, 438 So. 2d 757, 758-59 (Ala. 1983). The reasonableness of a plaintiff's reliance is a question of fact typically left for the jury. *See Federal Savs. & Loan Ins. Corp. v. Haralson*, 813 F.2d 370, 375 (11ᵗʰ Cir. 1987) (applying Alabama law); *Mid-State Homes, Inc. v. Holt*, 52 Ala. App. 415, 293 So. 2d 476, 481-82 (Ala. Civ. App. 1974). *Shutter Shop, Inc. v. Amersham Corp.*, 114 F. Supp. 2d 1218, 1227 (M.D. Ala. 2000) (footnote omitted). The omitted footnote provides:

Alabama courts originally applied a "reasonable reliance" standard in all misrepresentation cases. The Supreme Court of Alabama later switched to a less flexible "justifiable reliance" standard, which was used for less than ten years. Then, in *Foremost*, 693 So. 2d at 421, the Court re-adopted the reasonable reliance standard and directed that it be applied in all cases filed after March 14, 1997.

*Shutter Shop*, 114 F. Supp. at 1227 n.5.

1990) (plaintiff's reliance was not justifiable where all documents prepared by the defendant and signed by the plaintiff in connection with the transaction contradicted the plaintiff's asserted belief")), this court must look at the particular facts presented in this matter.

The DPSP clearly states that any authorized dealer, including FitnessZone could be terminated

> . . . at any time and without notice for any reason.  Failure to comply with any of these Standards may result in Trotter's unilateral termination without notice of authorized dealer status and cancellation of pending orders.  All compliance, termination, selection and authorization decisions are in Trotter's sole, complete and unilateral discretion.  Any failure to act or wavier by Trotter of any right concerning any dealer, regardless of the duration of such an action or waiver, and regardless of Trotter's intent, shall not impair Trotter from the later exercise of its rights. . . .

(Ex. 2 at 2).  The principals in this matter are all businessmen, they were all aware of the existence of the DPSP, and they were all aware of the issues presented by the use of the Internet. Their efforts to come to a mutually advantageous understanding concerning the marketing and distribution of Trotter products and their continued interaction from 1995 through FitnessZone's termination did not nullify the foregoing provision in the DPSP.  Under the circumstances, the court does not find the facts sufficient to overcome the defendant's motion for summary judgment on the claim the fraudulent suppression claim.

### E.  Unjust Enrichment Claim

The plaintiff next asserts, "Due to the plaintiff's marketing efforts and sales expertise, particularly since the plaintiff began selling Trotter equipment through the Internet, Trotter has and will continue to be enriched in the form of increased profits and enhanced name recognition and business reputation." (Doc. 23 at ¶ 51).  It further contends that this enrichment is unjust as a consequence of Trotter's wrongful conduct.  (*Id.*).

78

The Alabama Supreme Court has stated as follows:

It is well settled in Alabama that in order to succeed on a claim of unjust enrichment, the plaintiff must show that it had a reasonable expectation that there would be compensation for the services. *Burgess Min. & Const. Corp. v. Lees*, 440 So. 2d 321 (Ala. 1983). Furthermore, this Court has stated that the law implies a promise to pay for services rendered when they are knowingly accepted and there is an expectation of payment for those services. It is equally well established that there can be no recovery for services gratuitously rendered and where there is no expectation of payment. *Opelika Production Credit Ass'n, Inc. v. Lamb*, 361 So. 2d 95 (Ala. 1978); *Jacks v. Sullinger*, 284 Ala. 223, 224 So. 2d 583 (1969).

*Utah Foam Products, Inc. v. Polytec, Inc.*, 584 So. 2d 1345, 1350 (Ala. 1991). The Alabama

Court of Civil Appeals has further stated as follows:

Under the doctrine of quasi-contract, the law implies a contract, based upon the principles of equity, to prevent the unjust enrichment of one who knowingly accepts and retains a benefit provided at the detriment of another, who has a reasonable expectation of compensation. *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345 (Ala. 1991); *Opelika Prod. Credit Ass'n v. Lamb*, 361 So. 2d 95 (Ala. 1978); *Hendrix, Mohr & Yardley, Inc. v. City of Daphne*, 359 So. 2d 792 (Ala. 1978). The benefit conferred need not be strictly monetary:

"A person may be considered to have conferred a benefit upon another if he has given him possession of, or an interest in, land, chattels, or choses in action, or if he performs some service which is beneficial to or at the request of the other person, or if he satisfies a duty [or] a debt of the other. Whenever one person adds to the other's advantage in any form, whether by increasing his holdings or saving him from expense or loss, he has conferred a benefit upon the other."

*Opelika Prod. Credit Ass'n*, 361 So. 2d at 99. The amount of the recovery is limited to the value of the benefit gained by the defendant, regardless of the extent of the detriment to the plaintiff. *Opelika Prod. Credit Ass'n, supra*. The plaintiff bears the burden of proving the existence of the unjust enrichment and the reasonable value of the services rendered. *Utah Foam Prods., Inc., supra*.

*American Family Care, Inc. v. Fox*, 642 So. 2d 486, 488 (Ala. Civ. App. 1994).

The defendant asserts that this claim is due to be dismissed because the plaintiff "has

offered no evidence to support its assertion that Trotter has benefitted from this alleged 'quasi-contract.'" (Doc. 103 at 63). Specifically, Trotter contends that "there is no evidence that Trotter/Cybex has 'benefitted' in the form of increased profits and enhanced name recognition from FitnessZone's sales of Trotter and Cybex on the Internet. To the contrary, there is evidence reflecting that Trotter/Cybex was *harmed* by FitnessZone's Internet activities." (*Id*.). FitnessZone retorts that it (1) "invested heavily in its internet website to position itself as a leading website for fitness equipment," (2) "devoted substantial time and resources to developing its website and adding a catalog of Trotter equipment," and (3) "spent a substantial amount of money to purchase banner ads and keywords from Yahoo to ensure a top listing on the Yahoo search engine," resulting in increased exposure for the defendant's equipment. (Doc. 113 at 56).

In *Celotex Corp.*, 477 U.S. at 324, 106 S. Ct. at 2553, the Supreme Court stated that "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" The court does not find that the plaintiff has sufficiently challenged the defendant's motion for summary judgment to demonstrate a genuine issue of fact for trial of this claim.

As to the first assertion, that Trotter benefitted from FitnessZone's Internet activities, the record shows that FitnessZone did expend money and time purchasing banner ads and keywords from Yahoo. FitnessZone argues, therefore, that Trotter benefitted from the increased exposure for its equipment. (Doc. 113 at 56). The court does not find this conclusory allegation sufficient for a couple of reasons. Although the exposure increased FitnessZone's Internet exposure and access to customers, it also created the other dealer issues that led to the actions giving rise to

80

this suit.  At best, the evidence shows that the exposure was mutually advantageous to both

Trotter and FitnessZone.[54]  With regard to the assertion that Trotter received the benefit of the

development of the plaintiff's site because Trotter did not have the money to develop its own

(doc. 112 at 56), the court agrees that this provided Trotter with additional public exposure.

However, this is not sufficient in light of the concomitant benefit to FitnessZone.  It was the

recipient of the additional sales as well.  The endeavor was mutually beneficial to both.  Still

further, nowhere does this position take into account the difficulties caused by the Internet

activity.  The court, therefore, finds the plaintiff's response insufficient to overcome the motion

for summary judgment.

### F.  Recoupment Claim

FitnessZone lastly alleges that "due to Trotter's termination of the plaintiff's

distributorship, the plaintiff was and will be unable to recoup its investments" in the Internet

marketing program and elsewhere that were used to promote Trotter products.  (Doc. 23 at ¶¶

53-55).  The defendant asserts that this claim is due to fail because it is "entirely dependent on

the success of FitnessZone's promissory fraud claim . . . [which]" "fails for the reasons already

discussed." (Doc. 103 at 64).  Secondly, the defendant asserts that the motion for summary

judgment is due to be granted on this claim because "Alabama law does not recognize an

affirmative claim by a plaintiff for 'recoupment.'"  (*Id.*).

The defendant is correct in its second argument, recoupment is a claim that is akin to a

compulsory counterclaim.  *See Romar Development Co. v. Gulf View Management Corp.*, 644

---

[54] Murray testified at his deposition that Trotter's sales were down from 1997 to 1998.  However, he does not attribute
this decline to FitnessZone's Internet activities.  (Murray (1998) at 210-12).  To the contrary, he states that he did not believe his
"two consumer treadmill products [were] as competitive" and sales of his bike line were also down.  (*Id.* at 212-13).

So. 2d 462, 467 (Ala. 1994) (*quoting Ewing & Gaines v. Shaw & Co.*, 83 Ala. 333, 335, 3 So.

692, 693 (1888) ("recoupment 'authorizes the recovery of any damages sustained by the

defendant, which grow out of, or are connected with, the matters set forth in the plaintiff's

complaint, and in breach of the contract upon which his suit is founded, or in violation of any

duty imposed by the contract'")); *Alabama Power Co. v. Kendrick,* 123 So. 215, 218 (Ala. 1929)

("it has been repeatedly held that the fact that the plaintiff sues in tort is no reason why a plea of

recoupment should not be allowed, so as to settle and adjust the whole litigation arising out of

the same matter in one suit"); *Carolina Portland Cement Co. v. Alabama Const. Co.*, 50 So. 332,

334 (Ala. 1909) ("Pleas of set-off and recoupment are in effect complaints and declarations of

the defendant against the plaintiff."); *In re Sunbelt Vacation Travel, Inc.*, 94 B.R. 715, 717-18

(Bankr. S.D. Ala. 1988) ("Recoupment has been defined as 'the right of a defendant, in the same

action, to cut down the plaintiff's demand either because the plaintiff has not complied with

some cross obligation of the contract on which he sues or because he has violated some duty

which the law imposes on him in the making or performance of that contract.' 20 Am. Jur. 2d,

Counterclaim, Recoupment, Etc. 1 (1965); *see also Carolina Portland Cement Co. v. Alabama

Construction Co.*, 162 Ala. 380, 50 So. 332 (1909).  Recoupment is a recognized equitable

defense in Alabama. *Norton v. Bumpus*, 221 Ala. 167, 127 So. 907 (1930); *Carolina Portland

Cement Co., supra.*")).  Accordingly, summary judgment is due to be granted as to this claim.

## VI. DEFENDANT'S COUNTERCLAIMS

The defendant was permitted to advance three counterclaims for promissory fraud,

promissory estoppel, and intentional interference with its business relationships.  The claims are

premised on FitnessZone's purported promise "that it would share 75% of the profit off of sales

into other dealer's territories with the local dealer, so as to ensure the necessary servicing of the product would be performed by the local dealer, and that Trotter relied on that promise." (Doc. 110 at 1-2). The plaintiff asserts that all three claims are due to be dismissed on its motion for summary judgment. (Doc. 102). Each claim will be addressed individually.

## A. Promissory Fraud

FitnessZone asserts that its motion for summary judgment is due to be granted with respect to Trotter's promissory fraud claim because Trotter did not rely on any alleged promise by FitnessZone and because Trotter cannot establish an intent to deceive on the part of FitnessZone. (Doc. 102 at 8). Trotter retorts that FitnessZone promised Trotter that it would give 75% of the profit off of each extra-territory sale to the local dealer, that it reasonably relied on the promise to its detriment, and that FitnessZone had the requisite intent to deceive it. (Doc. 110 at 4-11). FitnessZone replies that Trotter (1) cannot pick and choose the terms of the proposed offer and call them misrepresentations when Trotter never accepted the offer, (2) cannot demonstrate reasonable reliance, and (3) cannot prove an intent to deceive at the time of the making of the purported representations. (Doc. 115 at 1-3).

As noted previously herein,

> To establish a cause of action for promissory fraud, the plaintiff must prove: (1) that the defendant made a false representation of a material fact; (2) that the false representation was relied upon by the plaintiff; (3) that the plaintiff was damaged as a proximate result of the reliance; (4) that the representation was made with a present intent to deceive; and (5) that when the representation was made, the defendant intended not to perform in accordance with it.

*Howard*, 611 So. 2d at 311. Trotter asserts that Cooke's testimony "easily provides evidence that the 75% profit sharing promise was made by FitnessZone." (Doc. 110 at 5). Citing to Cooke's

83

deposition, Trotter states that he "testified unequivocally that FitnessZone made the promise to deliver 75% of the profit to local dealers, and that this promise was part of an 'agreement' entered into between FitnessZone and Trotter at the August, 1996 meeting." (*Id.*, *citing* Cooke Dep. at 480-83). Trotter also cites to Murray's affidavit which provides, in pertinent part:

> No agreement overall was reached at that meeting on all of the issues with which Trotter was concerned. Trotter concluded that the totality of the elements of FitnessZone's suggested plan, such as Trotter giving FitnessZone a copy of its dealer book, which contained confidential information, was not feasible.
>
> However, FitnessZone's representatives promised Trotter that it would not make an internet sale into another dealer's territory without sharing 75% of the profit with the local dealer. This sharing of profit was consistent with what the company had recommended for years to its dealers on extra-territory sales, and was consistent with Trotter's transshipping policy, which had been in effect for all dealers since 1994. . . . Despite the fact that the parties could not reach an agreement on all of the issues, Trotter expected FitnessZone to keep its profit-sharing promise, particularly since it had been Trotter's policy since 1994 to assess a transshipping fee on sales into another dealer's territory that were made without the selling dealer getting the local dealer involved to ensure proper delivery, installation, and service. Trotter relied on FitnessZone's profit-sharing promise by continuing to supply FitnessZone with Trotter equipment for its sales. When FitnessZone nonetheless sold into another dealer's territory without this promised profit sharing, Trotter began assessing FitnessZone with transshipping fees on transshipping fees on transshipments it discovered.

(Doc. 112, Ex. D at ¶¶ 4-5).

With regard to Cooke's testimony, the record is clear that Cooke's purported agreement to allocate 75% of the profit from each extra-territorial sale to the local dealer was not independent of an overall proposal. Cooke testified that the memorandum was his understanding of the agreement. Specifically, he said that the memorandum "represented what we felt like was the actual agreement that we agreed to over dinner." (Cooke (2001) at 481). Nowhere did he state that FitnessZone "unequivocally" agreed that it would deliver 75% of the profit to the local dealer. To the contrary, it is evident that this was part and parcel of the overall agreement that was not

accepted.

To the extent that Murray asserts that "FitnessZone's representatives promised Trotter that it would not make an internet sale into another dealer's territory without sharing 75% of the profit with the local dealer," the court does not find this sufficient to overcome FitnessZone's motion for summary judgment. This representation, which is enumerated in the proposed agreement, is, as just noted, part of the proposal and not a distinct agreement. The record more correctly demonstrates that if there was any final agreement, it would be the entirety of Cooke's memorandum and not this one aspect. Trotter cannot accept a portion of the purported agreement while rejecting the other provisions to support its promissory fraud claim. *See Birmingham News Co. v. Crane*, 130 So. 681, 682 (Ala. 1930) ("It is quite correctly stated by counsel that appellee must accept or reject the proposal as a whole, and could not accept and act on a portion rejecting the balance without the consent, express or implied, of appellant.").[55] Because the entire proposal was not accepted, Trotter cannot, under the circumstances, rely on this portion of the discussions to support its promissory fraud claim.[56]

The court also is not impressed with Trotter's claim that it reasonably relied on FitnessZone's representation concerning profit-sharing on extra-territorial sales. As just stated, this representation was part of an overall proposal, nothing indicates that it was a distinct, agreed-upon term. To the extent that Trotter asserts that although "[t]he agreement as a whole

---

[55] In its opposition to FitnessZone's motion, Trotter asserts that "FitnessZone does not dispute in its summary judgment motion that it made the profit-sharing promise, and that it never shared profits with local dealers." (Doc. 110 at 5). What this statement fails to take into account is that FitnessZone asserts that the agreement included all the terms of the Cooke memorandum and not just the profit-sharing promise.

[56] The court also notes that if Trotter was laboring under the premise that there were to be separate and individual agreements and understandings and FitnessZone was proceeding under the premise that there was to be only one agreement, there was no meeting of the minds to support a binding agreement of any kind.

was not reached . . . FitnessZone's profit-sharing promise was made and relied upon," the court

finds that this conclusion is not supported by the record for the reasons stated above.  (Doc. 110 at

7).  Similarly, under the circumstances, the court cannot conclude that the evidence supports a

finding that Trotter reasonably relied upon a purported profit-sharing promise by FitnessZone.  In

fact, the record demonstrates to the contrary.  Trotter continued its relationship with FitnessZone

as it had prior to the August meeting.  In the letters from Trotter to FitnessZone concerning the

TSFs, there is no mention of the fact that FitnessZone was not paying the local dealer 75% of the

profit on each sale as allegedly agreed during the meeting.  Instead, Trotter imposed the TSF's

pursuant to the June 1, 1994 TSF policy (*see* Murray (1998), Vol. 1 at 238; Ex. X) whereby

Trotter assessed a $750 fee on a dealer that sold outside of its product territory without providing

service or without involving the local dealer to provide proper service.  (*See* Ex. 4).[57]  These facts

_____

[57] A January 24, 1997 letter from Trotter to Brasher states, in pertinent part:

It has been brought to my attention that there has [sic] been several sales made recently by your organization outside of Alabama.  As you are aware Trotter [sic] Performance Standards program clearly states that when a dealer sells Trotter products outside of their territory, that set up and delivery must be performed by an authorized TROTTER dealer.  Each TROTTER products [sic] that is trans shipped [sic] without involving the local Trotter dealer is subject to a $750.00 fee.

. . . .

The trans shipping [sic] policy [is] in place to help ensure that each Trotter customer receives the best sales, delivery and service available.  I strongly encourage you to involve the local Trotter dealer when selling products outside of your normal servicing market area to ensure these fees do not happen again. . . .

(Ex. 4 (January 24, 1997 Brasher letter)).  In a second letter on May 13, 1997, Trotter notified the plaintiff of additional TSFs (totaling $8,250.00), Trotter stated, in part,

This is the second notification . . . that the Fitness Zone [sic] has completed several sales outside your assigned market area without including Trotters [sic] local dealer.  As your are aware Trotters [sic] Performance Standards program clearly states that when a dealer sell [sic] Trotter products outside of their assigned market area, that set up and delivery must be performed by an authorized Trotter dealer.  Each Trotter product that is transshipped without involving the local dealer is subject to a $750.00 [fee.]

(*Id*. (May 13, 1997 letter)).  In another notice, Trotter informed FitnessZone that its sale of a treadmill to an out-of-state individual violated the DPSP and Internet policy, Fitness Zone [sic] will be charged back $750.00 for this violation.  This activity undermines our dealer distribution philosophy and compromises customer service.  (*Id*. (Undated letter with handwritten notations)).

86

do not support a conclusion that Trotter reasonably relied on the representations made at the

August meeting concerning extra-territorial sales.

Regarding FitnessZone's assertion that there is no evidence of an intent to deceive at the

time the representations were made, Trotter states that the evidence of an intent to deceive is

substantial. (Doc. 110 at 8). Specifically, Trotter points to the following: (1) FitnessZone's

reason for not following through with the promise, because Trotter would not share its dealer

book and therefore FitnessZone did not know who the dealers were, is specious; (2) Cooke's

August 1996 memorandum agreement was followed up by Trotter with a letter to FitnessZone,

reiterating, among other things, the 75% profit-sharing promise; (3) FitnessZone was not making a

profit during this period and payment of the agreed-upon sum would severely reduce the same;

(4) at the time of the representation, FitnessZone was negotiating with additional investors for

additional capital contributions; and, (5) FitnessZone failed to pay as agreed.[58]

As to the first item, that FitnessZone's answer as to why it did not go through with the

promise is specious, the court finds it necessary to place this assertion in better context. First,

Trotter simply states, in pertinent part, that "FitnessZone's interrogatory responses, and Bill

Cooke's testimony, state that FitnessZone did not share the profit as promised because Trotter did

not give FitnessZone its dealer book, and thus FitnessZone did not know who the dealers were."

(*See* Interrogatory Responses at no. 4, Exhibit K attached hereto; Cooke Dep. at 131-32 (2001)).

A close examination of Cooke's testimony shows that he was responding to questions from

---

[58] Concerning the last factor, Trotter notes that the Alabama Supreme Court has recently stated that although "the mere failure to perform the promised act is not by itself sufficient evidence of fraudulent intent . . ., 'the factfinder may consider that failure, together with the other circumstances'. . . ." (Doc. 110 at 10 *citing Ex parte Grand Manor, Inc.*, 778 So. 2d 173, 182 (Ala. 2000)).

counsel concerning the second paragraph[59] of the August 1996 memorandum regarding the

suggested 10% discount formula and not the provision dealing with the 75% extra-territorial sales

profit sharing paragraph[60] in the memorandum.  (Ex. 9).  Similarly, the snippet from the

interrogatory answer is out of context.  The question and answer are as follows:

> 4. When did you make the decision not to remit 75% of the profit off of a sale into another dealer's territory to the local dealer?  Why did you make that decision?

> 4. FitnessZone objects to this interrogatory . . . .  Additionally, FitnessZone objects to this interrogatory in that it is vague, ambiguous, and misleading because it mischaracterizes the nature of FitnessZone's discussions with Trotter concerning remittance of a portion of profits to the local dealer.  Trotter made the decision, despite FitnessZone's good faith efforts to address concerns which other dealers apparently expressed to Trotter, not to establish "dead zones," not to provide its dealer book to FitnessZone, not to resolve the issues discussed regarding FitnessZone's internet sales, and to represent to FitnessZone that Trotter would not terminate its business relationship with FitnessZone because of FitnessZone's internet activity, to continue filling orders from FitnessZone, and ultimately to terminate its business relationship with FitnessZone in July 1997 because FitnessZone refused to adhere to price restrictions to which other Trotter dealers had agreed.  When Trotter declined to live up to the terms of the understanding contained in FitnessZone's correspondence to Trotter, FitnessZone declined to remit 75% of its profits on its sales.

(Doc. 112, Ex. K at 4).  When this evidence is placed in context, it does not have the impact

asserted by Trotter.  It is not sufficient to overcome the motion for summary judgment.

---

[59] This paragraph provides,

> FitnessZone will adhere to Trotter's suggested discount formula of no more than 10% off suggested list price *providing* the dealer network will adhere to the same policy.  In the event that FitnessZone can verify a bona fide offer to FitnessZone customers for less than the 10% discount, FitnessZone will match that price.

(Ex. 9).

[60] This paragraph provides, "Upon receipt of the acceptance form, FitnessZone will remit to the dealer 75% of the profit, excluding shipping charges and a $75 fee to cover the costs for processing credit card discount, postage, etc."  (Ex. 9).

As to the second piece of evidence, Trotter's follow-up letter of October 24, 1996, it fails to demonstrate in any way that FitnessZone did not intend to perform as of August 18, 1996. Although Trotter is correct in that the letter does list the 75% remittance of profit to the local dealer, it also enumerates other terms that are inconsistent with FitnessZone's memorandum of the August 1996 meeting. Additionally, it states at the outset that it is "a follow up to our discussion regarding the internet" and is intended "to bring you [(FitnessZone)] up to date on Trotters [sic] current position regarding the internet." (Doc. 112 at Ex. D). The letter concludes that "[t]his program is different from the past plan we originally discussed." (*Id.*). It is clear that the parties were still negotiating at this juncture; therefore, this letter does not support the conclusion that FitnessZone had an intent to deceive Trotter on August 18, 1996.

As to the third piece of evidence, that FitnessZone was not profitable during this period and payment of the 75% remittance would severely reduce any profits, the court finds that this evidence is not persuasive. Trotter makes much of Brasher's deposition testimony that, "'at a bare minimum,' FitnessZone wanted to make between $700-$1,000 profit." However, Brasher's full testimony provides that those numbers were a "goal," but FitnessZone "would have taken less." (Brasher (2002) at 26). This evidence is simply too speculative to overcome the motion for summary judgment.

As to the fourth piece of evidence, concerning the fact that FitnessZone was seeking new investors at the time, Trotter states, "Brasher knew that he could never lure additional investors to his business if he was required to give 75% of the profit off Trotter internet sales to the local dealer; he knew it, and never intended to share such profit as a result." (Doc. 110 at 10). This once again is speculation and is inadequate to overcome the defendant's motion.

As to the fifth and final piece of evidence, the plaintiff's failure to perform, the court is once again not impressed.  Although this evidence is obviously relevant, it is not adequate to overcome the motion.  This is particularly true when the failure is placed in the context discussed above.  Trotter and FitnessZone were negotiating to resolve their differences; they never mutually agreed to the terms, as is evidenced by their subsequent communications; and, neither side performed as hoped.

All things considered, the motion for summary judgment as to this claim is due to be granted.

### B. Promissory Estoppel

FitnessZone asserts that its motion for summary judgment as to Trotter's promissory estoppel claim is due to be granted because Trotter cannot establish that it reasonably relied on the alleged representation or promise and because Trotter has not alleged any compensable damages.  (Doc. 102 at 5-8).  Trotter retorts that FitnessZone does not dispute "that the 75% profit-sharing promise was made" and that it reasonably relied on the promise to its detriment.  (Doc. 110 at 12).  FitnessZone's reply does not dispute that the representation was made, but counters that it cannot be separated from the overall proposal that was never accepted.  (Doc. 115 at 2).  FitnessZone also asserts that Trotter's purported reliance was not reasonable.  (*Id.*).

Premised on the discussion in the foregoing section, the court finds that the motion is due to be granted as to this claim as well.  Under the circumstances, the court does not find that Trotter's reliance on the representation was reasonable.  As stated already, the representation was made during the negotiations between the parties to resolve their differences over the use of the internet.  It is clear that there was no resolution of these matters.  The dialogue was continuing.

This is apparent from the communications between the parties following the August 18, 1996 meeting. There was never a meeting of the minds even regarding this one aspect of the dispute sufficient to support Trotter's promissory estoppel claim. Trotter never accepted the perceived understanding of the meeting, including the 75% profit-sharing component, that was detailed in the memorandum. Instead, at best, it offered a second proposal or counter-offer in Aguilar's October 24, 1996, letter. (Doc. 112 at Ex. C). This aspect of the meeting and subsequent discussions was clearly part of a hoped-for resolution that never materialized.[61] Trotter cannot isolate this one aspect and premise a claim thereon while in essence ignoring the remainder of the terms outlined in Cooke's memorandum following the meeting.[62] The motion is due to be granted as to this claim as well.

### C. Intentional Interference with Business Relationships

Trotter asserts that "FitnessZone intentionally and tortiously interfered with Trotter's business relationships with at least one and possibly other dealers by continuing to sell into those dealers' territories without sharing 75% of the profit from the sales with the local dealers." (Doc. 85 at ¶ 21). As a consequence of FitnessZone's actions, Trotter asserts that it sustained in excess of $250,000.00 in lost sales. (*Id*. at ¶ 22). FitnessZone asserts that its motion for summary judgment is due to be granted because Trotter "merely alleges that FitnessZone's breached promise to Trotter affected Trotter's other business relationships." (Doc. 102 at 10). In support of its position, FitnessZone relies upon *McCluney v. Zap Professional Photography, Inc.*, 663 So.

---

[61] The court notes that it is not accepting FitnessZone's proposition that before there can be reasonable reliance, there must be a contract. (*See* Doc. 115 at 2).

[62] Because of the court's finding as to the liability issue, it is not necessary or appropriate to address the damages question.

2d 922 (Ala. 1995) and *Cahaba Seafood, Inc. v. Central Bank of the South*, 567 So. 2d 1304 (Ala.

1990). Trotter responds that *Utah Foam Products, Inc. v. Polytec, Inc.*, 584 So. 2d 1345 (Ala.

1991), is more analogous. (Doc. 110 at 17).

Another judge of this court succinctly stated in *Chalal v. Northwest Med. Center, Inc.*,

147 F. Supp. 2d 1160, 1176 (N.D. Ala. 2000), the applicable considerations:

> In *Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590 (Ala.
> 1986), the Alabama Supreme Court explained the elements which must be
> established to support a claim of tortious interference with contractual relations or
> business relations in Alabama:
>
> > (1) The existence of a contract or business relation;
> > (2) Defendant's knowledge of the contract or business relation;
> > (3) Intentional interference by the defendant with the contract or business
> > relation;
> > (4) Absence of justification for the defendant's interference; and
> > (5) Damage to the plaintiff as a result of defendant's interference.
>
> *Id.* at 590. However, justification is an affirmative defense to be pleaded and
> proved by the defendant. *Id.* at 597; *see also Soap Co. v. Ecolab, Inc.*, 646 So. 2d
> 1366, 1371 (Ala. 1994). "Generally, whether the defendant is justified in the
> interference is a question to be resolved by the trier of fact." *Soap Co.*, 646 So. 2d
> at 1371.

For purposes of this analysis, the court will assume that the first two and the last elements

set forth above have been satisfied and the fourth is not at issue. The pertinent issue that remains

is whether FitnessZone intentionally interfered with the business relations of Trotter so as to state

a claim appropriate for submission to a jury. Under the facts presented, the court finds that Trotter

has not made the requisite showing.

In *Zap*, a special events photographer (Zap) sued a competitor (Flash Photography) for

intentional interference with business and contractual relations when Flash began aggressively

pursuing the same limited market. Flash countersued alleging, among other things, intentional

interference with its business. The trial court did not grant either party any relief. They appealed

and the Alabama Supreme Court affirmed the trial court, stating as follows on the intentional

interference counts:

> We will first address Zap's claims against Flash. It is undisputed
> that Zap had contracts with many of the organizations on the campus of the
> University of Alabama and that Zap sent to Flash a list of the organizations with
> which Zap had contracted. Flash's solicitations to all of the fraternities and
> sororities on campus through fliers, personal contact, and free T-shirts cannot be
> considered interference. The trial court's finding that Flash did not interfere with
> Zap's contractual relations when Flash informed its own fraternity clients that it
> would not take pictures if they allowed Zap's photographers into a party that was
> being co-sponsored by one of Zap's contract clients was supported by the evidence.

> Flash alleges that it was entitled to damages because of what it alleges was
> Zap's intentional interference with Flash's business or contractual relations. Flash
> bases this claim on Zap's attempt to "pack" parties at which there were both Zap
> and Flash photographers, and Zap's removal of Flash proofs from houses of
> organizations that Zap had under contract. Zap did not tortiously interfere with
> Flash's contractual or business relations by packing parties with its own
> photographers. The mere presence of additional photographers does not rise to the
> level of interference required for liability for this tort. The presence of other
> photographers at a party would not prevent Flash from taking as many photographs
> as it wanted, and Flash likewise could have brought in additional photographers if
> it felt that to do so would enable it to sell more photographs after the parties.
> Additionally, there is no liability under this tort for Zap's refusal to allow Flash to
> place its proofs in the houses of organizations with which Zap had an exclusive
> contract. The first element of this tort is the existence of a contract or business
> relationship. There is no contract or business relationship between Flash and Zap's
> clients, only between Flash and its own clients; therefore, there was no contract or
> business relationship to be interfered with.

*Zap Professional Photography, Inc.*, 663 So. 2d at 925-26. In *Cahaba Seafood*, the plaintiffs

including Cahaba Seafood, brought an action against the defendant bank alleging, among other

things, that Central intentionally interfered with Cahaba's business relations in refusing to honor

the terms of a line of credit agreement. The trial court entered summary judgment in favor of the

bank and the plaintiffs appealed. The Alabama Supreme Court held that because the intentional

interference claim involved an alleged breach of contract, a separate claim for intentional

interference with business relations was not permitted.  Affirming the trial court, the Supreme

Court stated as follows:

> In the case at bar, there is a dispute over the proper interpretation of the
> contract between Central Bank and the plaintiffs.  The plaintiffs' intentional
> interference claim involves an alleged breach of contract on the part of Central
> Bank that happened to affect their relationship with the Wynfrey Hotel.  The tort of
> intentional interference with business relations was intended to provide a remedy
> for situations where a third party intentionally interferes with the relationship of
> two contracting parties, not as a remedy for situations where an allegedly breached
> contract between two parties (here the plaintiffs and Central Bank) affects the
> relationship of one of the parties.

*Cahaba Seafood, Inc.*, 567 So. 2d at 1306.  In *Utah Foam Products*, a convoluted state court

action, the plaintiff (Polytec), a roofing contractor that was unsuccessful in obtaining a contract

from Teledyne, obtained a verdict following trial, finding, among other things and against various

parties, that the roofing supplier (Utah Foam) had interfered with its (Polytec's) business

relationship with Teledyne.  Utah Foam appealed the verdict, which was upheld.  In its opinion,

the Supreme Court stated:

> In the present case, a jury could conclude that, while outwardly operating
> in a role of assisting Polytec in making its presentations in an attempt to secure the
> contract with Teledyne, Utah Foam actually engaged in tactics behind Polytec's
> back to prevent Polytec from getting the contract, in order to secure the contract for
> itself.  Utah Foam attended the meeting with Teledyne at the request of Polytec in
> order to assist in the marketing of Polytec's products and services.  The evidence
> tends to show that Utah Foam, once in these meetings, attempted, and was
> eventually successful in its efforts, to discredit Polytec's products and services and
> to bolster its own.  Utah Foam continually gave the outward appearance of playing
> a role of assistance toward Polytec, but the jury could conclude that Utah Foam at
> every opportunity sought to turn Teledyne away from Polytec and to secure the job
> for itself.  Furthermore, Utah Foam's representative, Chadbourne, made the
> proposal to train Teledyne's applicators and to supply material and equipment,
> when neither Utah Foam, Teledyne, nor Lockridge was engaged in the roofing
> business.  Last, shortly after inspection of Lockridge's work on Teledyne's roof
> and approval by the City of Mobile's chief architect, Guarino, Chadbourne applied

94

a foam roof to Guarino's personal residence.

> Regardless of the fact that Teledyne maintains that it would not have awarded the contract to Polytec, Utah Foam's conduct thwarted Polytec's ability to adequately present its products and services and virtually eliminated any remaining possibility that Polytec could have been awarded the contract. Thus, we conclude that the plaintiffs presented sufficient evidence for the jury to find that Utah Foam tortiously interfered with Polytec's business relationship and that Polytec was damaged as a result of that interference.

*Utah Foam*, 584 So. 2d at 1353.

The facts in the foregoing cases make them inapposite to the situation at hand. To the

extent that Trotter attempts to analogize *Utah Foam* to the present case, the court does not find

that analogy persuasive. Trotter states that the defendant (FitnessZone) "was outwardly trying to

assist Trotter in resolving the channel conflict issues created by FitnessZone's nationwide internet

sales by promising Trotter it would share 75% of the profit on internet sales with the local dealer"

while "[b]ehind the scenes . . . FitnessZone never once shared such profits, never intended to

share such profits, and intended to keep making sales across the country without ever sharing any

profit with local dealers, knowing this would be extremely detrimental to Trotter's relationship

with its other dealers." (Doc. 110 at 17-18). The defendant's conduct in *Utah Foam*, however,

was substantially different from FitnessZone's actions in this matter. In *Utah Foam*, the

defendant supplier and its representatives met with the plaintiff's potential customers at the

plaintiff's request and then discredited the plaintiff's products and services to bolster their own;

the defendant undercut the plaintiff by offering to train the plaintiff's customer on how to apply its

product and by offering to and ultimately supplying materials and equipment when it was not in

the roofing business; and, it provided a city architect on the project with a similar foam roof for

his residence shortly after his inspection of the work and which was not paid for until a third party

action was filed as part of the *Utah Foam* action.[63]

This court does not find that the actions of FitnessZone, as alleged by Trotter, are sufficient to allow this claim to proceed to trial.  FitnessZone and Trotter were struggling to find the most effective way to access the Internet and deal with the concomitant problems.  The evidence is insufficient to show that FitnessZone's conduct rose to the level necessary to constitute tortious interference with business relations, requiring submission of this claim to the jury.  FitnessZone did not improperly solicit business as the defendant's did in *Utah Foam*, it did not disparage Trotter, and its conduct arguably appears to have increased the public's exposure to the defendant's products and even encouraged competition.  In sum, the court does not find Trotter's assertion that FitnessZone's failure to "keep its promise" to share extra-territorial profits with the other Trotter dealers sufficient to overcome the motion for summary judgment.  (Doc. 85 at ¶ 19).  Any impact the dispute between FitnessZone and Trotter had on others, such as All About Fitness, is simply not sufficient to constitute intentional interference with a business relationship.

## VII.  CONCLUSION

Premised on the foregoing, the court finds that the defendant's motion for summary judgment is due to be granted in part and denied in part.  The court also finds that the plaintiff's motion for summary judgment as to the defendant's counterclaims is due to be granted.  The court further finds that the motion to dismiss is moot.  An order consistent with this memorandum opinion will be entered separately.

---

[63] The third-party action was filed nine months after the work was completed. *Utah Foam*, 584 So. 2d at 1349.

**DONE**, this the _19th_ day of August, 2003.

**JOHN E. OTT**
United States Magistrate Judge